## CALLAN v. ANDREWS.
### No. 242.

Circuit Court of Appeals, Second Circuit.
March 9, 1931.

David L. Podell, of New York City (Herman Shulman, Mortimer Hays, and Joseph Lotterman, all of New York City, of counsel), for appellant.

Weill, Wolff & Satterlee, of New York City (Lloyd P. Stryker, Henry F. Wolff, and William Gilligan, all of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff, Callan, was a tax expert, who had been continuously employed for some two years before the events in question by the defendant, Andrews, a promoter. Andrews was interested in securing the "listing" on the Chicago Stock Exchange of an issue of bonds of the General Vending Corporation, which the Exchange refused to admit while Andrews remained trustee of a voting trust of the company's stock. Unless the bonds were "listed" by January twentieth, he stood to take $1,500,000 of them from Lisman, a banker; if they were, he was relieved. In December at New York at an interview at the office of his attorneys, Andrews asked Callan to go to Chicago that day and try to get the bonds "listed." Callan agreed to do so, except that he could not leave that day. They had another interview on the next day, when, according to Andrews, he told Callan that if he went, he, Andrews, would try to get Lisman, who was present, to give him a thousand shares of General Vending stock. Callan's story was that Andrews promised to give him the shares himself. It was then also agreed that if the exchange would not accept Andrews as voting trustee, Callan might be substituted.

Callan went to Chicago, failed to get the bonds "listed" so long as Andrews was a trustee, but succeeded, when he, Callan, was put in his place. On his return he wrote, asking for the shares, and Andrews replied that he would try to get them from certain shares reserved for employees, or from Lisman's shares. Andrews had himself a large number of shares, all held in escrow, under a contract not necessary to describe. Lisman had other shares; there were still others in the hands of third persons, and, as above mentioned, there were some reserved by the company for employees, over which Andrews

had some control. How far Callan knew, when he went to Chicago, that Andrews' own shares were all deposited in escrow, was in dispute. At the second interview Andrews had made him a director of the company and had given him an option to buy certain of the shares. These were in the form of voting trust certificates, but Callan denied that he knew that they were in escrow. In May Callan demanded the shares, Andrews refused to recognize any liability, and Callan brought suit.

On the main issue the judge left to the jury only the question whether Andrews had promised to give Callan the shares himself, or had said no more than that he would try to get them from Lisman. He refused to charge that they might find Andrews' promise to have been no more than a gift. As to damages he also refused to charge that the jury might find that Callan knew that Andrews' shares were in escrow, and that the time of delivery might therefore be that of their release. He left it to them to find the value of the shares within a reasonable time after Andrews' refusal in May. As the release of Andrews' shares from the escrow took place some time later, and after they had fallen in value, this made a substantial difference. The jury found a verdict, based upon the value at the time of the repudiation, on which judgment was entered.

The appeal raises two main questions; first, whether the evidence was such as required a dismissal, because the promise was gratuitous, or at least a submission of that question to the jury; second, whether the measure of damages was wrong. The appellant also raises the question whether the jury might have found that Callan's promise was in consideration of his election as director, and the concomitant option. We can, however, find no exception which raises this, and in any case, in the view we take, it becomes immaterial upon this record.

■ Andrews' theory is that, Callan having at the first interview already agreed to go to Chicago, his own promise on the next day to give him one thousand shares of stock could not have been the inducement for the services rendered, and was therefore without consideration. This, because the consideration for a promise must be a quid pro quo, something given in exchange; else it is merely for a gift and nudum pactum. We are not disposed to enter into a discussion of the question so sought to be raised, or to consider how far the general rule has now been modified. Restatement of Contracts, § 90 Amer.

L. I. In the case at bar the evidence did not justify a dismissal, and the requests to charge did not raise the question. It was certainly permissible from the earlier relations of the parties, for a jury to infer that there was an implied promise to pay a reasonable price for the services to be rendered. If so, nothing was left but to settle the amount, and this might be later agreed upon. On the following day, when Andrews said, as we must assume he did, that he would give Callan one thousand shares of the stock, and when Callan assented, the price became fixed which had before been uncertain. Put into paradigm, Callan agreed to release his unliquidated claim and to substitute the shares; Andrews agreed to give the shares in consideration of the release of the unliquidated claim. The evidence admitted of only this interpretation, provided that Callan's first promise had not been an office of friendship. It would certainly have been improper to direct a verdict for the defendant.

The requests to charge did not raise any question as to the character of Callan's original promise. We may take the third as the least imperative, and that to which the defendant was best entitled. This in substance was that if Callan agreed to go, and went, to Chicago as the result of the first interview, and if the promise to give him the shares was not an inducement, but was treated as a gratuity, the jury might find it a gift. Thus. the request was consistent with the assumption, which the evidence justified, that there had originally been an implied promise of payment. If so, the only possible interpretation was that Andrews' promise intended to fix the consideration, and it could not have been a gratuity. Callan was concluded by his acquiescence from asking more; Andrews, by his offer from giving less. Had he wished to raise the question whether Callan's original promise was gratuitous, this was not the way to do it. We do not say that he might not have been entitled to go to the jury on that question. On another trial the record may be different, and we defer any conclusion; the trial judge may then prefer to take a verdict on that issue as well, but we cannot anticipate his decision on another state of facts.

■ We should affirm the judgment had it not been for the rule of damages adopted. The learned judge apparently supposed either that, in cases of anticipatory breach damages were to be reckoned as though the time of delivery was accelerated, or that there was no evidence from which the jury might conclude that the promised shares were those in

escrow. Neither conclusion was in our judgment correct. While a jury might well have found that Andrews meant to get the shares at large, since twenty per cent. of the stock was neither in escrow, in Lisman's control, nor allocated to the employees, that was by no means an inevitable conclusion. It is true that if Callan knew nothing as to how Andrews stood in the stock, Andrews' actual position would be irrelevant. Callan was entitled to suppose that a promise to give him the shares, meant a promise to get them on his demand. In that event the time chosen to fix their value was the right one. If, on the other hand, he knew that Andrews had no free shares available, and a large number in escrow, even though it was possible to get them elsewhere, a jury might conclude that the shares in mind were those in escrow.

The evidence as to Callan's knowledge is in much uncertainty. Andrews swore expressly that he had told him in the preceding August that his shares would all be "tied up" until the company "made good," and that Lisman's would be the only "free stock." Callan at least knew that there had been some sort of contract affecting the stock; and in the following May he spoke of Andrews' having much earlier "turned the stock over to other people, or agreed to do so." On the other hand, in January Andrews in a telegram asked a subordinate to give Callan the shares due himself on the employees' contract, so as to make up the thousand shares. As to the shares in which Callan got the option when he became a director, the testimony was also at variance. These were in fact in escrow, but it is impossible to say with certainty whether Callan had been so informed. We need not decide how much he did know, but it seems to us apparent that we cannot say that the case was too clear for submission to the jury. They should have determined what shares the parties contemplated.

If the contract was for shares in escrow, the time for delivery was when they became free, and the anticipatory breach did not change it. It is the promise which fixes performance; nothing can alter it except a new agreement. This, so far as we can find,

is the uniform rule in the United States with an exception to be noted in a moment. Skeele Coal Co. v. Arnold, 200 F. 393 (C. C. A. 2); Second National Bank v. Columbia Trust Co., 288 F. 17, 26, 30 A. L. R. 1299 (C. C. A. 3); Missouri Furnace Co. v. Cochran (C. C.) 8 F. 463; Edelstone v. Schimmel, 233 Mass. 45, 123 N. E. 333; York-Draper Co. v. Lusk, 6 Kan. App. 629, 49 P. 788; Williston, Contracts § 1397; Sedgwick on Damages, § 636-d. As to the sale of goods, the Uniform Sales Act, §§ 64(3), 67 (3), has now codified the same rule. Segall v. Finlay, 245 N. Y. 61, 156 N. E. 97; Dimon Corp. v. Federal Sugar Ref. Co., 215 App. Div. 140, 213 N. Y. S. 106. In England apparently the rule is the same (Roper v. Johnson, L. R. 8 C. P. 167; Melachrino v. Nickoll, [1920] 1 K. B. 693), unless the market be obviously changing (Nickoll v. Ashton, [1900] 2 Q. B. 298; Roth v. Taysen, 8 Asp. Mar. C. 120), or unless the promisee covers (Melachrino .v. Nickoll, supra [semble]). That there may be circumstances which will impose upon the promisee a duty to cover, we need not deny, though they must be indeed rare. Ordinarily we cannot agree that it is reasonable to require him to divine the course of an "obviously" changing market, about which no one's judgment is of any value. At least there is no such situation here; Callan was under no such duty. His loss was the same as though he had waited till the time of performance arrived. Some of our language in Skeele Coal Co. v. Arnold, supra, which was not necessary to the result, appears to have been inadvertent.

The exception we spoke of is not relevant here, and we need only allude to it. It concerns those cases in which a contract for future delivery is treated as a commodity, like "futures" in grain, cotton or the like, dealt in on exchanges. When the parties understand that the contract is itself property, the promisee may be entitled to replace it, since it has a present sale value in his hands. Samuels v. E. F. Drew & Co. (D. C.) 286 F. 278, affirmed 292 F. 734 (C. C. A. 2); Cox v. Crane Iron Works, 5 F.(2d) 314 (C. C. A. 3); Williston, § 1397.

Judgment reversed; new trial ordered.