**CONTINENTAL GRAIN CO. v. SIMP-
SON FEED CO., Inc.**

No. B–207.

United States District Court
E. D. Arkansas, N. D.

Dec. 17, 1951.

355

---

Karol A. Korngold, St. Louis, Mo., Kaneaster Hodges, Newport, Ark., W. D. Murphy, Jr., Batesville, Ark., for plaintiff.

Fred M. Pickens, Jr., Wayne Boyce, Newport, Ark., for defendant.

LEMLEY, District Judge.

This cause, submitted on written briefs, comes on for hearing upon the plaintiff's motion, filed herein pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., for judgment in accordance with its motion for a directed verdict, which latter motion was made at the conclusion of all of the evidence in the case and upon which we reserved our ruling at the trial. The material facts are practically undisputed with one exception which will be hereinafter discussed, and are substantially as follows:

Plaintiff is a Delaware corporation engaged in buying and selling grain, including soybeans, and has its principal place of business in St. Louis, Missouri. The defendant is an Arkansas corporation and operates a grain elevator · at Newport, Arkansas. On September 14, 1950 the parties entered into a contract under the

terms of which the plaintiff agreed to buy from the defendant, and the defendant agreed to sell to the plaintiff, 10,000 bushels of soybeans of a certain grade and quality at $2.20 per bushel; delivery was to be made during the period from October 1, 1950 through November 30, 1950, at seller's option, and the plaintiff was to furnish shipping instructions to the defendant as the several carloads of beans were loaded. A carload of soybeans contains approximately 2,000 bushels.

On October 30, 1950 the defendant loaded a car of beans for the plaintiff and called on the latter for shipping instructions which were furnished on the same day; these beans were shipped to an oil mill in Abilene, Texas, to which they had been sold by the plaintiff. Upon shipment, the defendant drew a draft on the plaintiff for 90% of the purchase price of the beans; this was in accordance with the custom of the trade; and the draft was duly paid when presented. The remaining 10% has not been paid.

On October 31, 1950 the defendant loaded another carload of beans for the plaintiff and called upon it for shipping instructions. There is a conflict in the evidence as to just what took place when these instructions were requested; a witness for the defendant testified that the plaintiff's agent stated that the instructions would be furnished within 30 minutes; the plaintiff's agent testified that defendant's agent was told that plaintiff desired to consign this carload of beans to New Orleans for export, that a clearance would have to be obtained from the authorities at that point for the reception of the beans, and that shipping instructions would be furnished as soon as such a clearance was obtained, which might be in 30 minutes or as late as two days.

In any event, shipping instructions for this car were not given until November 2, about 48 hours after they had been requested, and when plaintiff furnished the instructions it was informed that the defendant considered that the contract had been breached, and that no more beans would be shipped thereunder. Plaintiff declined to agree to cancellation and insisted on performance; the defendant, however, refused to deliver any more beans under the contract.

Between October 31 and November 2 the railroad began to press the defendant either to move the carload of beans or to unload it, as there was a car shortage. Defendant had commitments with parties other than the plaintiff for the sale of soybeans, and when the railroad insisted that the car be moved or unloaded, defendant billed it out to another of its customers. After this billing of the car, but before it was moved, the defendant received the instructions from the plaintiff with which it declined to comply.

As stated, the plaintiff declined to accept the defendant's repudiation of the contract, and its attitude in this connection was communicated to the defendant on November 2 and again on November 7. On November 27 plaintiff wrote the defendant and offered it an extension of time for delivery under the contract; in this letter it warned the defendant that unless the contract was complied with it would go on the market as of 9 A. M. on December 1 and buy beans for the defendant's account and charge the latter with the difference between the contract price and the market price. Defendant, however, did not avail itself of the offer of extension, nor did it deliver any more beans to the plaintiff.

Between the date of the contract and November 30 the price of soybeans rose substantially and steadily. On November 2 the price was substantially higher than it was on September 14, and on November 30 and December 1 it was substantially higher than it was on November 2. There was no material difference in price, however, between November 30 and December 1.

On December 1, 1950 the plaintiff purchased 8,000 bushels of soybeans for the defendant's account, and thereafter brought this action to recover the difference between the market price paid for the beans and the contract price plus interest.

The defendant in its pleadings and at the trial admitted the execution of the contract sued upon and further that it had shipped only one carload of beans, but it contended

 

that the delay of the plaintiff in furnishing shipping instructions with respect to the second carload was a substantial breach of the contract which justified it in refusing further performance. Defendant also filed a cross-complaint asking judgment against the plaintiff for that portion of the purchase price of the first carload of beans for which it had not been paid; its contention in this regard is not denied.

The case was tried to a jury, and, as stated, at the conclusion of all of the evidence plaintiff moved for a directed verdict. We reserved our ruling, and the case was submitted upon interrogatories [1]; the jury was unable to agree upon its answers and was finally discharged. Thereafter, the plaintiff filed its present motion.

In support of the motion, plaintiff contends: (1) that, on the evidence, the question of whether the plaintiff furnished the defendant with shipping instructions for the second carload of soybeans within a reasonable time after being notified that the beans were loaded, is a question of law for the Court, and that the Court should declare, as a matter of law, that such instructions were given within a reasonable time; (2) that the question of whether the delay in furnishing shipping instructions amounted to a material breach of the contract, which justified the defendant in treating it as rescinded, is, likewise, a question of law

for the Court and that the evidence is conclusive that the delay was such that it did not constitute a material breach, justifying the defendant in treating the contract as rescinded, either in whole or in part; and (3) in the alternative, that the contract was severable as a matter of law, and that plaintiff's breach, if any, was not in any event material as to the final 6,000 bushels of beans called for by the contract and, therefore, the Court should enter judgment for the plaintiff at least with respect to such 6,000 bushels. The defendant controverts all of these contentions.

■ In passing upon the motion, the evidence, and the inferences which may be fairly drawn therefrom, must be considered in the light most favorable to the defendant; and if there is substantial evidence in the record tending to establish a material breach of the contract on the plaintiff's part which would justify the defendant in refusing further performance, the plaintiff's motion should be denied. Duncan v. Montgomery Ward & Co., 8 Cir., 108 F.2d 848; Jones v. United States, 8 Cir., 112 F.2d 282; Johnson et al. v. J. H. Yost Lumber Co., et al., 8 Cir., 117 F.2d 53; Brinegar v. Green, 8 Cir., 117 F.2d 316; Coen v. American Surety Co., 8 Cir., 120 F.2d 393; Long v. Clinton Aviation Co., 10 Cir., 180 F.2d 665. On the other hand, if there is no substantial evidence to that

---

1. The interrogatories which, accompanied by appropriate instructions, were submitted to the jury are as follows:

"*Interrogatory #1:* Do you find from a preponderance of the evidence that the plaintiff, after being notified on Tuesday, October 31, 1950 that the defendant had a second carload of beans ready for shipment, failed to furnish shipping instructions to the defendant for said second carload of beans within a reasonable time after such notification, taking into consideration all of the facts and circumstances in the case as shown by the evidence? (Answer 'Yes' or 'No'.)"

"*Interrogatory #2:* If you have answered Interrogatory #1 in the affirmative, then: (a) State whether or not you find from a preponderance of the evidence that the plaintiff's failure to furnish shipping instructions within a reasonable length of time after being notified that the defendant had a second carload of soy-

beans ready for shipment, was such a material breach of the contract as would justify the defendant in cancelling the contract as to the second carload of soybeans. (b) If you have answered Part 'a' of this Interrogatory in the affirmative then state whether or not you find from a preponderance of the evidence that the plaintiff's failure to furnish shipping instructions within a reasonable time after being notified that the defendant had a second carload of soybeans ready for shipment was such a material breach of the contract as would justify the defendant in cancelling the contract not only as to the second carload of soybeans but also as to the remaining 6,000 bushels of soybeans?" (Do not answer either part unless your answer to Interrogatory #1 is 'Yes', and do not answer Part 'b' of this Interrogatory unless your answer to Part 'a' thereof is 'Yes'.)"

effect, judgment should be entered for the plaintiff. Dustin Grain Co. v. McAllister, 8 Cir., 296 F. 611.

Under the terms of the contract, the plaintiff was required to furnish shipping instructions to the defendant within a reasonable time after being notified that the latter had beans ready for shipment under the contract, and an unreasonable delay in furnishing such instructions would constitute a breach of the contract. Majestic Milling Co. v. Copeland, 93 Ark. 195, 124 S.W. 521; Joppa Mattress Co. v. Arkansas Valley Cotton Oil Co., 101 Ark. 548, 142 S.W. 831. Plaintiff contends in this connection that, as a matter of law, the delay of 48 hours in furnishing shipping instructions for the second carload of beans was not unreasonable but we do not know that we can say that reasonable men might not differ on that point, particularly in view of the conflicting evidence as to what was said by plaintiff's agent when notified that the second carload of beans was ready for shipment, which conflict, of course, must be resolved in favor of the defendant. It does not necessarily follow, however, that the plaintiff is not entitled to judgment on its motion, since if plaintiff's breach, if any, was purely technical and insubstantial, such would not justify the defendant in refusing further performance, although it might give rise to a claim for damages, if any were sustained; Uniform Sales Act, Sections 45(2) and 65, Ark.Stats. §§ 68–1445(2) and 68–1465; Helgar Corporation v. Warner Features, Inc., 222 N.Y. 449, 119 N.E. 113. Therefore, the substantial question involved here is whether or not the breach in question was sufficiently material to justify the defendant in attempting to cancel the contract.

The question of the materiality of a breach of the contract under the sections of the Uniform Sales Act just cited is ordinarily one of fact for the jury, but where the facts are undisputed with respect to the breach, the question becomes one of law for the Court. 46 Am.Jur., "Sales", Section 270; 3 Williston On Contracts, Section 866; Helgar Corporation v. Warner Features, Inc., supra; American Tube & Stamping Co. v. Erie Iron & Steel Co., 281 Pa. 10, 125 A. 304; Speed v. Bailey, 153 Md. 655, 139 A. 534; Birmingham News Co. v. Fitzgerald, 222 Ala. 386, 133 So. 31.

In determining whether or not a breach on the part of a buyer, with respect to one installment of a contract for the sale of goods to be delivered and paid for in installments, is so material as to justify the seller in refusing to perform further, numerous factors are to be considered. In the Helgar case, supra [222 N.Y. 449, 119 N.E. 114], the Court was concerned with whether or not a failure on the part of the buyer to pay for certain installments within the time fixed by the contract for such payments justified the seller in refusing to make further deliveries; and the Court said: "The vendor who fails to receive payment of an installment the very day that it is due may sue at once for the price. But it does not follow that he may be equally precipitate in his election to declare the contract at an end. (Citing cases.) That depends upon the question whether the default is so substantial and important as in truth and in fairness to defeat the essential purpose of the parties. Whatever the rule may once have been, this is the test that is now prescribed by statute. The failure to make punctual payment may be material or trivial according to the circumstances. We must know the cause of the default, the length of the delay, the needs of the vendor, and the expectations of the vendee. If the default is the result of accident or misfortune, if there is a reasonable assurance that it will be promptly repaired, and if immediate payment is not necessary to enable the vendor to proceed with performance, there may be one conclusion. If the breach is willful, if there is no just ground to look for prompt reparation, if the delay has been substantial, or if the needs of the vendor are urgent so that timely performance is imperiled, in these and in other circumstances, there may be another conclusion. Sometimes the conclusion will follow from all the circumstances as an inference of law to be drawn by the judge; sometimes, as an inference of fact to be drawn by the jury."

In the Restatement of the Law of Contracts, Section 275, it is said that the factors to be considered in measuring the materiality of a breach of such a contract include the following: (1) the extent to which the injured party will obtain the substantial benefits which he could reasonably have anticipated; (2) the extent to which the injured party may be adequately compensated in damages for lack of complete performance; (3) the greater or less hardship on the party failing to perform in terminating the contract; (4) the willful, negligent, or innocent behavior of the party failing to perform, and (5) the greater or less uncertainty that the party failing to perform will perform the remainder of the contract. In the following section, 276, of the Restatement, it is stated that in mercantile contracts performance at the time agreed upon is important, and if the delay of one party is considerable, "having reference to the nature of the transaction and the seriousness of the consequences," and is not justified by the conduct of the other party, the latter need not perform further.

■ Assuming that the conduct of the plaintiff with respect to the second carload of soybeans amounted to a breach of its contract, nevertheless, when such breach is viewed in the light of the above-mentioned factors, we believe that, as a matter of law, it was insubstantial and did not have the effect of relieving the defendant of its obligation to perform its contract further, either with respect to the 2,000 bushels of soybeans loaded on October 31 or as to the remaining 6,000 bushels, which were never loaded.

■ While it appears that the parties contemplated that deliveries were to be made in installments and paid for separately, no particular number of installments or times for shipment were specified, and the defendant had the right, had it seen fit to do so, to tender all of the beans either on the first or the last day of the contract period. Plaintiff had no right to insist on delivery of any part of the beans prior to November 30. As a matter of fact, no beans were loaded until October 30, approximately six weeks after the contract was entered into and almost at the end of the first month of the contract period. The fact that the defendant was given approximately two and one-half months from the date of the contract to complete delivery, coupled with the fact that it did not undertake to perform until the month of October was practically gone, demonstrates to our mind that neither party was in a particular hurry with respect to these deliveries, and that time was not of the essence of the contract, except to the extent that the defendant was obligated to complete its deliveries by the end of November. At the time of the assumed breach, twenty-eight days of that month remained.

There is no suggestion that the plaintiff's delay in furnishing shipping instructions manifested any inability on its part to perform its contractual obligations, or that it evidenced any intent on its part to repudiate the contract or to abandon further performance under it, and there is no evidence that the defendant so construed it. On the contrary, the undisputed evidence is that on and after November 2 plaintiff advised the defendant that it intended to perform fully and urged the defendant to do likewise, even going so far as to offer it an extension of time within which to complete deliveries.

Defendant sustained no substantial damages as a result of the plaintiff's delay, nor did it run the risk of future damage. The marked rise in the price of soybeans between September 14 and November 2 gave it a considerable margin of safety had the market begun to fall, which it did not do. Moreover, defendant was under contract to furnish beans to others at even lower prices than that at which it had contracted with the plaintiff. The only damages that the defendant could have suffered as a result of the plaintiff's delay, under the evidence in this case, would have been demurrage on the car, or the expense of unloading it, and interest for two days on the money which it had tied up in the second carload of beans. The plaintiff, on the other hand, as a result of the defendant's refusal to perform further has sustained damages to the extent of several thousand dollars.

There is no showing here that the plaintiff's delay was either willful or negligent. Its explanation that it spent the 48 hours in

obtaining clearances from New Orleans, and that as soon as such clearances were obtained it furnished the defendant shipping instructions, is unchallenged.

Under such circumstances we do not feel that any reasonable man, in the exercise of fair and impartial judgment, could conclude that plaintiff's delay was such a material breach as to justify the defendant in cancelling the contract either in whole or in part.

The case of Barnett v. Elwood Grain Co., 153 Mo.App. 458, 133 S.W. 856, 858, is in point here; in that case the vendor contracted to sell grain to the vendee to be delivered in installments; each installment was to be paid for by the vendee upon presentation of a sight draft; certain installments were shipped, and the drafts covering them were not paid for four or five days. Vendor refused to make further shipments, and litigation arose. At the trial of the case the vendee offered explanations as to why the drafts were not immediately paid, but the court found that the contract had been breached. It was held, however, that the breach was so immaterial that as a matter of law the vendor was not justified in refusing to make further shipments. In this connection, the Court, after stating that the vendor "had a right to refuse to make future deliveries and declare the contract forfeited, if the circumstances justified it in so doing" (citing cases), said: "But the breach of the contract was so insignificant in respect to the delay in payment of the drafts after notice, and the defendant not having sustained but small damage thereby, we do not believe under the circumstances defendant was justified in declaring the contract canceled. The breach was technical, and the extent of defendant's damage was the use of the money during a short time (citing authorities)".

The defendant cites Henderson v. McFadden, 5 Cir., 112 F. 389, 391, where it was held to be a jury question whether a delay of three or four days on the part of the vendee in accepting certain cotton which had been purchased by it, justified the vendor in refusing to ship. The facts in that case, however, differentiate it from the instant case; there the vendors were insisting that the cotton be taken immediately as they "were compelled in (their) business to have the money", wanted to stop insurance, and were pressed for storage space; moreover, when vendee's agent did not appear on the scene at the time originally contemplated, vendors sent several telegrams to him urging him to come. In the instant case, as pointed out, the parties do not appear to have been in any hurry with respect to delivery, there was no showing as to any particular need of the vendor to ship the carload of grain loaded on October 31 to the plaintiff, particularly since it had other outstanding contracts; and, further, the defendant here gave no notice or warning whatever to the plaintiff that it was concerned with the delay or that it would cancel the contract unless shipping instructions were immediately forthcoming.

The Arkansas case of Attridge v. Smith, 105 Ark. 626, 152 S.W. 300, also cited by the defendant, is likewise distinguishable. There purchasers of timber, for stipulated prices per thousand feet, entered into a contract under the terms of which it was contemplated that they would begin cutting during the season of 1907 and "use diligence in cutting and manufacturing the timber, and that no other timber should be manufactured by appellants (vendees) during the time specified, namely, three years from and after April 15, 1907." Vendor was to be paid as the timber was cut. In spite of repeated efforts by the vendor to induce the vendees to commence operations, the latter failed to do so and finally, on December 1, 1907, the vendor gave the vendees written notice to cut on certain tracts; vendees left the state and in January, 1908, the vendor gave notice of forfeiture of the contract. The Court held that time was of the essence of the contract, and that the evidence was sufficient to sustain the finding of a breach of the contract and of an abandonment thereof by the vendees. There is little resemblance between the Attridge case and the instant one.

In the Joppa Mattress Company case, supra, the vendee delayed for over two months in furnishing shipping instructions,

as compared to the 48 hours involved in the instant case, and the jury found that such delay was unreasonable and justified the vendor in refusing to ship when the instructions were received. The Arkansas Supreme Court reversed, however, on the ground that the instructions given to the jury did not permit it to consider a request made by the vendee for additional time to furnish instructions, to which request no reply had been made by the vendor.

We are of the opinion that the evidence in the instant case permits only one inference to be drawn with respect to the plaintiff's assumed breach of contract, and that is that it was trivial and insubstantial and did not justify the defendant in refusing, either in whole or in part, to perform the contract further. In truth the defendant entered into a contract with the plaintiff which became disadvantageous when the soybean market rose, and from all of the facts and circumstances in the case we can not escape the conclusion that the defendant simply seized upon what was at most an inconsequential breach on the part of the plaintiff as an excuse for release from that contract. No justification has been shown for its so doing, and the motion for judgment will be granted.

▆ The question of plaintiff's measure of damages, must, of course, be decided in the light of Section 67(3) of the Uniform Sales Act, Ark.Stats. § 68–1467(3), which establishes the measure of the buyer's damages where the seller fails or refuses to deliver the goods contracted for; this section insofar as is pertinent here, is as follows: "Where there is an available market for the goods in question, the measure of damages, in the absence of special circumstances showing proximate damages of a greater amount, is the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered or if no time was fixed, then at the time of the refusal to deliver."[2]

The plaintiff argues that November 30, 1950 was the time fixed for the delivery of the soybeans, and that its damages should be measured by the difference between the contract price and the market price of the beans as of that date; defendant contends, on the other hand, that no time was fixed by the contract for the delivery of the beans, and that the difference between the contract price and the market price of the beans on November 2, 1950, the date it notified the plaintiff that it would not make further shipments, should be the measure of the plaintiff's damages, if the latter is entitled to recover. It further contends in this connection that the plaintiff was required to go on the market and buy beans as soon as it received notice of the repudiation in order to mitigate its damages.

We are of the opinion that in effect the contract involved here required the defendant to deliver the soybeans on or before November 30, 1950, and that the date last mentioned was the time when they "ought to have been delivered", as that phrase is used in the above-quoted section of the Uniform Sales Act. We do not think that the fact that the plaintiff had an option to deliver prior to November 30 rendered the time for performance uncertain or brought into play the last clause of said section.

▆ We have found no cases applying Section 67(3) of the Act to contracts calling for the delivery of commodities on or before a certain date; said section, however, does not represent any departure from the common law, which measured the buyer's damages by the difference between contract and market price at the time of breach, such time being considered the day on which the goods should have been delivered if a time was fixed for delivery or the date of repudiation if no such time was fixed. 15 Am.Jur. "Sales", Section 677, pages 802–803; Bunch v. Potts, 57 Ark. 257, 21 S.W. 437; Little Rock Cooperage Co. v. L. N. Lanier & Co., 83 Ark. 548, 104 S.W. 221, Id., 88 Ark.

---

2. A similar measure of damages for the seller when the buyer refuses to accept delivery is prescribed by Section 64(3) of the Sales Act. Ark.Stats. § 68–1464(3).

557, 115 S.W. 401; Arkansas Short Leaf Lumber Co. v. McInturff, 134 Ark. 284, 203 S.W. 1047; Little Rock Lumber & Manufacturing Co. v. Boynton & Co., 147 Ark. 19, 226 S.W. 515; Lamkins v. International Harvester Co., 207 Ark. 637, 641, 182 S.W.2d 203; see also Belisle v. Berkshire Ice Co., 98 Conn. 689, 120 A. 599, 34 A.L.R. 114 et seq. Under the common law where a contract called for delivery of goods within a given period of time, and there was a failure of performance, the innocent party's damages were measured by the difference between the contract price of the goods and the market price prevailing on the last day of the period; Haff v. Pilling, C.C., Pa., 134 F. 294; New York & Philadelphia Coal & Coke Co. v. Meyersdale Coal Co., 3 Cir., 236 F. 536; Ana Maria Sugar Co. v. Quinones, 1 Cir., 251 F. 499; Kutztown Foundry & Machine Co. v. Sloss-Sheffield Steel & Iron Co., 3 Cir., 279 F. 627; La Independencia, S. A. et al. v. McAdams, Tex.Civ.App., 206 S.W. 732; and this measure of damages was not affected by a repudiation by one of the parties prior to the last day of such period, at least where, as here, the innocent party refused to accept such repudiation as a breach and continued to insist upon performance. Walker-Smith Co. v. Bilao, Tex.Civ.App., 204 S.W. 777; Belisle v. Berkshire Ice Co., 98 Conn. 689, 120 A. 599, 34 A.L.R. 108.

In Walker-Smith Co. v. Bilao, supra, [204 S.W. 778], the seller contracted to deliver goods "during the fall" of 1916, a period which the Court considered to be the months of September, October, and November. In October the seller repudiated the contract without just cause; and the buyer refused to accept the repudiation and insisted upon performance throughout the entire contract period. It was held that November 30, the last day upon which the contract could have been performed, was the date upon which it was breached, and that the buyer's damages should be measured with reference to market prices prevailing on that day.

Belisle v. Berkshire Ice Co., supra, presented the converse of the instant case for there it was the buyer, rather than the seller who repudiated; the contract called for the delivery of ice on or before November 1, 1919; in September the buyer notified the seller that it would not take the ice, but the seller did not accept this repudiation. The court held that the seller's damages were to be measured as of the time the contract was breached, and that in view of the seller's refusal to accept the buyer's repudiation the time of the breach was November 1. The Court said: "On September 3, 1919, (the) defendant absolutely, distinctly, and unequivocally refused to perform its promise, and gave unmistakable evidence of its renunciation. But this did not make a breach of this contract. It remained a subsisting contract unless and until the other party, the plaintiff, gave equally unmistakable evidence of his acquiescence or acceptance of the defendant's repudiation. * * *

"The record before us does not show that the plaintiff had accepted or acquiesced in this defendant's repudiation of this contract. Therefore it was never broken. By its terms it remained in uninterrupted existence until November 1, 1919. At any time until that day this defendant, notwithstanding its letters to the plaintiff, had the right to take the entire quantity of ice specified in its contract. By its refusal to exercise that right within the time limited, it broke its contract on the last day fixed. The trial court correctly held that the breach was made on November 1, 1919. * * *

"When (plaintiff) received notice of this defendant's repudiation of [its] contract, the plaintiff had the right to choose whether he would adopt the repudiation or would treat the contract as still subsisting and assume that this defendant would perform its part before the time for such performance should expire. He chose to follow the latter course. Hence a breach of the contract by this defendant alone did not occur until the time for performance by it had come and passed, and not until then would a cause of action on the con-

tract arise." 120 A. at page 602, 34 A.L.R. at page 112–113.[3]

Since, as stated, the enactment of the Uniform Sales Act did not change the common law with respect to damages, we are of the opinion that contracts calling for the delivery of goods on or before a certain date are governed by the provisions of the first clause of Section 67(3) of said Act, rather than by the second. Hence, November 30, 1950 was the time fixed for the delivery of the soybeans involved in the instant case, and plaintiff's damages are to be measured by the difference between the contract price of the beans and the market price prevailing on the date last mentioned, unless the earlier repudiation by the defendant imposed upon the plaintiff the duty of making an immediate purchase on the open market for the purpose of mitigating its damages.[4]

While we have found no Arkansas cases which are directly in point in connection with mitigation of damages, the general rule in the United States is that a buyer who refuses to accept a seller's anticipatory refusal to deliver the commodities contracted for, and who insists upon performance by the latter, is not required to go upon the open market and purchase upon receipt of notice that the seller does not intend to perform. He has a right to treat the notice as inoperative, to wait until the time for performance has passed, and then buy on the open market, charging the seller with the difference between the contract price of the goods and the market price which prevailed at the time that performance should have been forthcoming. 15 Am.Jur. "Damages", Section 50; 46 Am.Jur. "Sales", Sections 678, 681 and 688; Williston On Contracts, Rev. Ed., Sections 1337, 1383, and 1397; Restatement Of The Law of Contracts, Section 338; Callan v. Andrews, 2 Cir., 48 F. 2d 118, 120; Joseph Denunzio Fruit Co. v. Crane, D.C.Cal., 79 F.Supp. 117; Missouri Furnace Co. v. Cochran, C.C., Pa., 8 F. 463; Fahey v. Updike Elevator Co., 102 Neb. 249, 166 N.W. 622; Walker-Smith Co. v. Bilao, supra.

There are two reasons for this rule. First, to require the innocent party to make an immediate purchase or sale upon receipt of notice of the other's repudiation would encourage such repudiation on the part of the seller or of the buyer as the market rose or fell. See Fahey v. Updike Elevator Co., supra. Second, the immediate action of the innocent party might not have the effect of mitigating his damages, but might, on the other hand, enhance them. Williston On Contracts, Section 1397, Callan v. Andrews, and Missouri Furnace Co. v. Cochran, both supra.

The only Arkansas case which we have found which deals with a vendee's duty to

3. It is to be noted in connection with this case that on November 1, 1919, the date of the defendant's breach, there was no available market for ice, and, consequently, the usual measure of damages could not be applied. The Court allowed loss of profits under Conn.Gen.Stat. Section 4730, which provided that the damages were to be measured by "the estimated loss directly and naturally resulting, in the ordinary course of events, from the buyer's breach of contract." This is the identical language employed in Section 64(2) of the Uniform Sales Act, Ark. Stats. § 68–1464(2); this decision was rendered in 1923, however, and it does not appear that at that time Connecticut had adopted the said Act. See note, "Comparative Legislation", following Ark.Stats. § 68–1401.

4. From our holding that the contract between the parties fixed a time for the delivery of the soybeans, it follows that the defendant's repudiation of the contract prior to that time amounted to an anticipatory breach thereof, which the plaintiff was free either to accept or reject. Williston on Contracts, Rev.Ed., Section 1337; 12 Am.Jur. "Contracts", Sections 391, 395. As stated, plaintiff refused to accept defendant's repudiation, the effect of which action was to keep the contract open for the benefit and at the risk of both parties. 17 C.J. S., Contracts, § 472, page 978. Defendant's argument that its breach, if any, was of a "present duty to perform" cannot be sustained for, on November 2, 1950, there was no such duty; defendant had a right to wait until the last day of the contract period and then deliver; it could not be compelled to deliver at any earlier date. 46 Am.Jur. "Sales", Section 162.

mitigate his damages upon the vendor's anticipatory breach of contract is Arkansas Short Leaf Lumber Co. v. McInturff, supra; while the question arose in that case in such a manner that the decision cannot in any way be considered as controlling here, certain language employed by the Court appears to be in accord with the general rule just mentioned. In that case the vendor contracted to deliver lumber at a certain price per thousand board feet; thereafter he refused to deliver unless the vendee would pay him fifty cents per thousand more, which the vendee refused to do. At the trial of the case the vendor contended that the vendee should have accepted its proposition in order to mitigate his damages and should not recover more than fifty cents per thousand. The Court disagreed; after recognizing the general rule that one injured by a breach of contract is required to take reasonable steps to minimize his damages, and after stating that this rule had been applied in numerous Arkansas cases, the Court said: "* * * none of (such cases) appears ever to have extended this doctrine so far as to require one to abandon the assertion of a legal right in order that the party making the illegal and unauthorized exaction may not be required to pay an increased sum as damages. * * *" 134 Ark. at page 289, 203 S.W. at page 1049.

In our opinion the plaintiff was not required to buy on the open market prior to November 30, and its contentions with respect to its measure of damages should be sustained; such damages are to be measured by the difference between the contract price of the beans, $2.20 per bushel, and the market price of $2.73 per bushel which prevailed on November 30, when the contract was breached, and on December 1 when the plaintiff actually bought. Plaintiff is also entitled to interest on this difference from December 1, 1950 at the rate of 6% per annum. Ark. Stats. § 68–1470; Bunch v. Potts, supra; Jerome Hardwood Lumber Co. v. Davis Brothers Lumber Co., 161 Ark. 197, 255

S.W. 906. Plaintiff concedes that the defendant is entitled to credit on this judgment in the amount of its counterclaim, $441.87, plus 6% interest thereon from November 1, 1950. A judgment in accordance with the foregoing will be entered.[5]

---

5. Defendant failed to ship 7,991.5 bushels, and the principal amount of plaintiff's judgment will be $4,235.50.