The **QUAKER OATS COMPANY, a Corporation, Plaintiff,**

v.

**BRINKLEY DRYER & STORAGE COMPANY, Inc., Defendant.**

Civ. A. No. H-646.

United States District Court
E. D. Arkansas, E. D.
July 31, 1958.

Canale, Glankler, Montedonico, Boone & Loch, Memphis, Tenn., Mann & McCulloch, Forrest City, Ark., for plaintiff.

Sharp & Sharp, Brinkley, Ark., for defendant.

JOHN E. MILLER, District Judge.

Fndings of Fact

1.

The plaintiff, The Quaker Oats Company ·(hereinafter referred to as Quaker), is a New Jersey corporation. The defendant, Brinkley Dryer & Storage Company, Inc. (hereinafter referred to as Brinkley), is an Arkansas corporation having its principal place of business in Monroe County, Arkansas. The amount in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

2.

In 1956 Quaker purchased a substantial amount of oats from Brinkley. Most, if not all, of these purchases were made through brokers. In each case after the broker had negotiated the transaction, Quaker sent to Brinkley a contract of purchase on Quaker's Form 324, and in each case Brinkley signed a copy of the contract and returned the same to Quaker. It was the custom of the larger companies, such as Quaker, to require these formal contracts on major transactions. It was also the custom of Brinkley to require such contracts upon any shipment of a large quantity of oats. Six of these contracts were entered into in June of 1956, and each contract called for No. 2 oats, 34-lb. test, and each contract had a provision for discounts for oats testing less than 34 lbs. per bushel. All these contracts were fulfilled by Brinkley,. apparently to the satisfaction of Quaker.

On April 29, 1957, J. W. Rascoe, Brinkley's manager, made a telephone call to George Seeds, a broker with Commodity Brokerage Company, Memphis, Tennessee, advising that Brinkley would like to sell ten carloads of oats. Seeds had formerly worked for Quaker for a number of years and had only been a grain broker for about one year. This

was the first transaction Seeds, as a broker, had with Brinkley. Seeds checked with Paul Mulroy, a man who had formerly been his assistant at Quaker and who had succeeded him as a manager, and received a bid of 67¢ per bushel for 34-lb. No. 2 oats. It was the intention of Quaker, acting through Mulroy, to purchase 34-lb. No. 2 oats without any provision for a discount. In other words, Quaker wanted only oats that would test at least 34 lbs. per bushel. On the other hand, it was the intention of Brinkley, acting through Rascoe, to sell 34-lb. No. 2 oats with the regular scale of discounts for oats testing less than 34 lbs. per bushel. That is, it was Rascoe's intention and understanding that Quaker would accept oats weighing less than 34 lbs. per bushel, but a discount would be allowed because of the lower test quality of the oats. In 1956 the regular discount was ½ cent per bushel for each pound less than 34, and in 1957 the discount was 1 cent per bushel for each pound less than 34 down to 30 lbs.

After receiving the bid from Quaker, Seeds telephoned Rascoe and advised him that Quaker wished to purchase the oats at 67¢ per bushel. Seeds did not inform Rascoe that Quaker expected 34-lb. No. oats without any provision for a discount. Rascoe agreed to sell the oats at that price, and Seeds then prepared a written confirmation of sale, sending two copies to Quaker and two copies to Brinkley and keeping one copy for his company. The confirmation of sale, among other things, contained the following information:

"Commodity Brokerage Company
69 Union
Memphis, Tenn.

"April 29, 1957                                              No. 34–57

"Quaker Oats Company
"Memphis, Tenn.

"Gentlemen:

"We hereby confirm sale to you for the account of Brinkley Dryer and Storage Co., Brinkley, Ark. of approximately Twenty Five Thousand (25,000) Bushels, 34 pound #2 oats.

"Price     Sixty Seven cents (.67¢) per bushel delivered Memphis, Tenn.  Via Cotton Belt R'way.

"Weights   Memphis              Grade     Memphis

"Shipment June–July 1957

"Brokerage ½¢ per bu. by seller."

Quaker and Brinkley each received copies of the broker's confirmation, and each signed one copy, returning it to Seeds. Rascoe signed the copy on behalf of Brinkley and at the time of such signing still understood that he was selling 34-lb. No. 2 oats with the regular scale of discounts. He did not pay too much attention to the broker's confirmation because he knew that Quaker always sent its regular contract form No. 324 for execution. It was also Rascoe's understanding that the broker's confirmation was merely a bookkeeping record for the broker, and was not a contract.

On April 29, 1957, Quaker sent Brinkley its proposed contract No. 1226 on its standard form No. 324. Among other things, this contract contained the following standard provisions:

"8. Grain shall be milling quality, cool and sweet on arrival at mill.

"9. We shall not be liable for any loss or damage due to our inability to take delivery at time and place

specified arising out of any strike, car shortage, embargo, delay, or any other cause beyond our control.

"10. Seller agrees to ship in any car not less than the railroad prescribed minimum weight."

If Brinkley had shipped oats under this proposed contract, Quaker would not have accepted them unless the oats were cool and sweet as provided in standard provision No. 8 in the contract, and would have expected Brinkley to comply with standard provision No. 10 of the contract.

Upon receiving this contract Rascoe noticed that it had no discount provision and that it called for oats "34 lbs. test or better." On May 3, 1957, Rascoe wrote the following letter to Quaker:

"Quaker Oats Co.
Memphis, Tenn.
"Mr. Paul Mulroy:

"I am returning to you Contract # 1226 so you can add the Discount rate of 1¢ Per Bu. for test wt. under 34 lbs. and also remove the words 34 lbs test or Better.

"Return the new Contract and I will sign it.

"We can not guarantee 34 lbs or Better oats."

For some reason this letter did not reach Mulroy, and apparently the matter was overlooked by all parties for a few weeks. When it was finally learned that there was a dispute between the parties as to whether a contract was in existence, a number of telephone calls were made and a number of letters were written concerning the controversy. Early in June 1957 Rascoe advised Mulroy that Brinkley would not ship 34-lb. No. 2 oats without a discount provision. Rascoe also told Mulroy to "buy in" the oats if he thought there was a valid contract between Quaker and Brinkley.

On June 19, 1957, Mulroy wrote Rascoe as follows:

"Dear Mr. Rascoe:

"A couple of days ago we were advised by Commodity Brokerage Company that you were to write us a letter of partic-ulars on the status of the ten cars, approximately 25,000 bushels, of oats for which you contracted with us through Commodity Brokerage on April 29, 1957. To date we have not received this correspondence and presume that this letter will be forthcoming shortly.

"In one of our phone conversations, you stated that you had signed and returned our contract. We have made a thorough search of all our files, and have failed to locate this copy. By return mail, would you please advise us as to approximately when you signed and mailed this copy, so that we, in turn, can put a tracer out through the local post office. Much obliged."

In the letter of June 19 Mulroy made reference to a signing of the contract by Rascoe. Actually Rascoe did not sign the proposed contract at any time because of the absence of a discount provision.

On June 24, 1957, Seeds wrote Rascoe as follows:

"Dear Mr. Rascoe:

"After talking with you today I called Mr. Paul Mulroy with Quaker Oats Company regarding shipment of the oats that are due on our contract 34–57.

"As you know this contract calls for 34 pound oats and as I had explained to Mr. Mulroy it has not been possible to get any oats at near this test weight from the present crop. You may recall that at one time he agreed to take oats that would not be lower than 30 pounds and at that time I told him that you could not guarantee that they would be 30 pounds or better.

"Today he agreed to accept one car as a test regardless of the test weight, at the usual scale of discounts and if these could be used by his mill in their production he would let you ship the balance under the same basis.

"Please let this first car come out as soon as possible and advise me when it moves and I will do all that I can to see that it is accepted as the basis for the balance of the contract."

At the time of the trial Rascoe did not remember having received or read this letter.

On July 8, 1957, Seeds wrote Rascoe as follows:

"Dear Mr. Rascoe:

"With reference to our many conversations regarding our Contract 34–57 with Quaker Oats Company for 25,000 bushels of 34 pound No. 2 oats for shipment during June and July 1957.

"Quaker Oats are willing to accept a lighter test weight oat on this contract and in view of the fact that they feel that this contract is still in force it is my honest suggestion that you make some effort to make delivery or at least make settlement with them.

"During the past several weeks several elevators in this area have been compelled, for various reasons, to make cancellation of oat contracts and I can assure you that I will do what ever I can to have any settlement as reasonable as possible.

"I hope that you will reconsider and permit me to negotiate a settlement for you.

"Please let us hear from you."

At the time of the trial Rascoe did not recall having received or read this letter.

On July 26, 1957, Mulroy wrote Rascoe as follows:

"Gentlemen:

"Regarding our contract No. 1226 for 10 cars, approximately 25,000 bushels, No. 2–34 No. test or better Oats for June–July 1957 shipment, via the St. Louis & Southwestern Railroad. To date, we have received no advice as to shipments having been made.

"If shipment is not made by July 31, we will be required to purchase this commodity on the open market at currently prevailing prices.

"Should this price be in excess of your contract, we shall look to your company for the difference."

About a week after August 1, 1957, Quaker contacted Seeds and requested him to purchase the oats that Brinkley had refused to ship. Seeds contacted several parties, and on August 23, 1957, arranged to purchase the oats for Quaker from the Portis elevator, Lepanto, Arkansas. The broker's confirmation of this sale contains the following provisions:

"Commodity Brokerage Company
69 Union
Memphis, Tenn.

"Date    August 23, 1957                    No. 179–57

"Quaker Oats Co.
Memphis, Tenn.

"Gentlemen:

"We hereby confirm sale to you for the account of Portis Elevator, Lepanto, Ark. of Approximately 25,000 bushels Red Oats No. 2 – 34 pound. Discounts 1¢ each one-pound test weight under 34 lb., 1¢ for weathered or slightly weathered.

"Price    86½¢ per bushel delivered Memphis, Tenn., proper.

"Grades    Memphis official          Weights    Memphis official

"Shipment    As soon as possible, in cars to protect minimum freight rate.

"This purchase to replace 25,000 bushel 34-pound Red Oats covered by Quaker Oats Cont. No. 1226, dated April 29, 1957, and Commodity Brokerage Co. Cont. No. 34–57, Apr. 29, 1957.

"Draw Slight Draft, with B/L attached, thru National Bank of Commerce, Memphis, Tennessee."

This confirmation was followed by a written contract of purchase on Quaker's form 324, said contract, among other things, containing the following provisions:

"The Quaker Oats Company
Board of Trade Bldg.
141 West Jackson Boulevard
      Chicago 4

Show No. on
All Papers ___184___

Memphis, Tennessee   August 23, 1957
      City                      Date

"We Confirm Purchase
made today from
"Portis Elevator Company
Lepanto, Arkansas

of _____ cars  25,000  bushels
Milling Quality  No. 2–34 Lb. test oats

"Remarks: Through: Commodity
      Brokerage Company

Price   86½¢   Per Bu. on track

at   Memphis   _____
                        Weights

"Show contract number on all papers.

Subject to   Memphis   Inspection

Ship to us at   Memphis

"SD/BL through National Bank
of Commerce, Memphis, Tenn.
"1¢ per bu. disc. ea. lb. test to
31 lbs.
1¢ per bu. disc. a/c slightly
weathered.
Any Oats testing lower than 31
test No. 3's a/c slightly weathered will not apply."

Shipment   Memphis
Route   Mo. Pac. R. R.

All papers to   Memphis

On August 26, 1957, Mulroy wrote Rascoe advising him of the purchase of the oats from Portis and that Brinkley would be charged with the difference of 19½ cents per bushel.

On October 10, 1957, Mulroy wrote Brinkley advising that the excess cost of the oats was $5,095.21, being "the aggregate difference between our contract No. 184 with Portis Elevator Company of Lepanto, Arkansas, and our contract No. 1226 with you, Brinkley Dryer & Storage Company." Mulroy requested prompt remittance of the said amount by Brinkley.

3.

In 1957 the oat season was over about June 25, and during June, July, and August, Brinkley at all times had in excess of 25,000 bushels of oats, although these oats would not have tested 34 lbs. or better per bushel. After it was learned that Quaker intended to buy the oats from Portis, Brinkley offered to sell the same amount of oats to Quaker under the same terms and with the same conditions as the contract with Portis. Brinkley offered to make this sale either through its own name or under the name of its subsidiary, Palmer Grain Company. Quaker did not accept this offer of Brinkley.

4.

Quaker was a member of the Grain and Feed Dealers National Association, but Brinkley was not a member of said

Association. The Association has a number of rules which apply to its members.

Among other things the rules of the Association contain the following provisions:

"Rule 6. *Confirmation.* \* \* \*

"(b) When a trade is made through a broker, it shall be the duty of the broker, on the day of trade, to send a written confirmation to each of the principals (to the buyer a confirmation of sale, and to the seller a confirmation of purchase), setting forth the specifications of the trade as made by him. Upon receipt of said confirmation the parties thereto shall carefully check all specifications named therein, and upon finding any differences, shall immediately notify the other party to the contract, and the broker; by wire, or telephone and confirm in writing. In default of such notice the contract shall be filled in accordance with the terms of the confirmation issued by the broker.

\* \* \* \* \* \*

"Rule 10. *Incomplete Shipments:* When the seller finds that he will not be able to complete a contract within the agreed limit, it shall be his duty at once to advise the buyer by mail, telephone or telegraph, whereupon it shall be the duty of the buyer at once to elect either to buy in or cancel the deficit, or, with the consent of the shipper, to extend the contract to cover the said deficit.

"If the seller fails to notify the buyer of his inability to complete his contract, as above provided, the liability of the seller shall continue, until the buyer, by the exercise of due diligence, can determine whether the seller has defaulted, when the buyer shall immediately (a) agree with the seller upon an extension of the contract to cover the deficit, (b) cancel the contract outright, or (c) buy in the deficit for the seller's account.

\* \* \* \* \* \*

"Rule 23. *Loading Minimum:* It shall be the duty of the seller to load cars in accordance with the rules and regulations of the initial railroad; and to assume any loss resulting from the non-observance of such rules and regulations.

\* \* \* \* \* \*

"Rule 40. *Brokers:* \* \* \*

"(b) A broker has power to bind his principals only to the extent of his instructions and the principals are not liable for any acts of the broker in excess of such instructions.

\* \* \* \* \* \*

"(e) A broker who, in good faith, negotiates a contract which is in accord with instructions from both his principals, who, at the time of negotiations, advises each principal the name of the other, and who completes such negotiations in accordance with the rules and customs governing such transaction, thereby fulfills all his obligations and has no further liability to either of his principals. The contract so negotiated is valid and binding between the buyer and the seller, the same as if it has been negotiated directly between them."

5.

After considering all the evidence, the court finds that the fair market value of 34-lb. No. 2 oats at Memphis on August 1, 1957, was 75 cents per bushel.

The fair market value of 34-lb. No. 2 oats at Memphis in June of 1957 was approximately 65 cents per bushel.

### Discussion

The principal issue in this case is whether the parties entered into a valid contract. Plaintiff contends that such a contract was executed and has been breached by the defendant, while the defendant takes the position that no contract was ever entered into and thus there could be no breach.

■■ The sine qua non of a valid contract is a meeting of the minds of the parties upon every essential term of the agreement. Malco Theatres, Inc., v. Boswell, 211 Ark. 143, 148, 199 S.W. 2d 606; Gatling v. Goodgame, 209 Ark. 867, 871, 192 S.W.2d 878. A consideration of the evidence in the instant case convinces the court that there was no meeting of the minds of the parties at any time, and that no valid contract was ever entered into. Compare, Southern Cotton Oil Co. v. Frauenthal, 145 Ark. 394, 224 S.W. 730; Porter v. Gossell, 112 Ark. 380, 166 S.W. 533; Cage v. Black, 97 Ark. 613, 134 S.W. 942. At all times it was the intention and understanding of Brinkley, acting through Rascoe, to sell 34-lb. No. 2 oats with the standard discount provision. Similarly, at all times it was the intention and understanding of Quaker, acting through Mulroy, that it was purchasing 34-lb. No. 2 oats with no discount provision. Brinkley did not at any time agree to sell the oats without a discount provision, and Quaker did not at any time agree to purchase the oats with a discount provision. Quite obviously, there was no meeting of the minds of the parties, and resultingly there was no contract unless it can be said that the broker's written confirmation in some way amounted to a contract binding on both parties.

■ The broker's confirmation purportedly confirmed a sale from Brinkley to Quaker of approximately 25,000 bushels of 34-lb. No. 2 oats at 67 cents per bushel. Nothing was said in the confirmation about the presence or absence of the usual scale of discounts. Moreover, nothing was said in the broker's confirmation as to the requirement by Quaker that the oats arrive at the mill cool and sweet; that Quaker would not be liable for any loss caused by strikes or other causes beyond its control; and that the seller must not ship less than the railroad prescribed minimum weight per car. These latter requirements were standard provisions of the contracts customarily executed by Quaker with its sellers on Quaker's form No. 324. From all the evidence it is clear that the broker's confirmation did not purport to contain the complete agreement of the parties and that no contract was complete until one was formally executed by both parties on Quaker's form No. 324, as had always been done by Quaker and Brinkley in past transactions.

In this case, as was customary, Quaker sent Brinkley a proposed contract on its form No. 324, said contract being No. 1226. This contract called for No. 2 oats, 34-lb. test or better. This was not in accordance with Rascoe's understanding, and he wrote Mulroy returning the contract unsigned and requesting the addition of the discount provision and the deletion of the words "34-lb. test or better." Plaintiff contends that its contract form No. 324 is designed primarily for accounting purposes, but this contention is clearly without merit. Standard provisions 8, 9, and 10 of the contract have nothing whatsoever to do with accounting, and Quaker insisted on compliance with these provisions by its sellers. The fact that the formal contract on Quaker's form 324 was intended to be and was actually the contract between the parties is illustrated by Quaker's own action in referring to this alleged agreement as "our contract No. 1226" in the letter of July 26, 1957, from Mulroy to Rascoe (set out in Finding of Fact No. 2).

■ Plaintiff contends that under rule 6 of the Grain and Feed Dealers National Association, Brinkley was obligated to notify Quaker and the broker immediately if the written confirmation were incorrect. There are several answers to this contention. In the first place, Brinkley was not a member of the Association, and was not bound to follow its rules. See, Emco Mills, Inc., v. Isbrandtsen Co., 8 Cir., 210 F.2d 319. Secondly, the confirmation did not purport to contain the entire agreement of the parties, and Brinkley had no way of knowing that the usual discount provision was not intended by Quaker to

apply to this transaction. And in any event, within three or four days Rascoe, after receiving the proposed contract from Quaker, wrote Quaker returning the proposed contract so the discount provision could be added. It is true that Quaker's manager, Mulroy, apparently did not receive this letter, but this was through no fault of Brinkley.

Plaintiff also contends that parol evidence cannot be introduced to establish defendant's contention that the standard discount provision was intended to be a part of the contract, and that there was no meeting of the minds. Under the Arkansas law "the parol evidence rule does not apply where the entire agreement of the parties has not been reduced to writing, and the rule does not exclude parol evidence of the part not in writing when there is no conflict between the oral and written parts of the contract. See, Almand v. Alexander, 180 Ark. 947, 951, 23 S.W.2d 611; Blaine v. Darwin, 160 Wash. 327, 295 P. 131; Comment, 4 Arkansas Law Review 168, 174; 20 A.L.R. Pages 477-481." Wilkinson v. Feild, D.C.W.D.Ark., 108 F.Supp. 541, 548. See also, Jackson County Gin Co. v. McQuistion, 177 Ark. 60, 5 S.W.2d 729. Parol evidence is admissible in the instant case to show that there was in fact no meeting of the minds of the parties, and thus no valid contract was ever entered into.

If Brinkley had taken no action to notify Quaker of the misunderstanding with respect to discounts, it may be that Brinkley would have ratified the confirmation agreement under the reasoning of the court in Emco Mills, Inc., v. Isbrandtsen Co., supra. In that case the seller waited more than two weeks to notify the broker and more than a month to notify the buyer of the mistake in the broker's confirmation, and the court held

that such inaction on the part of the seller amounted to a ratification of the terms of the confirmation agreement. In the instant case Brinkley notified Quaker within three or four days of the misunderstanding with respect to discounts and therefore Brinkley cannot be said to have ratified the provisions of the broker's confirmation.

Having determined that no valid contract was entered into between the parties, the court must necessarily conclude that there could be no breach of contract by defendant, and the plaintiff is entitled to no recovery in this action. This conclusion of the court is decisive of the case, but the court feels that it should mention one further matter in this discussion.

Even if plaintiff's contentions were sustained, that is, (1) both Quaker and Brinkley were bound by the rules of the Grain and Feed Dealers National Association, and (2) there was a valid contract between the parties, plaintiff would be in no better position. This is true because Brinkley notified Quaker early in June 1957 that it would not ship the oats in accordance with the claimed contract, and under Rule 10 of the Association plaintiff was obligated at that time to elect to buy in or cancel the deficit or to extend the contract. At that time the market price of 34-lb. No. 2 oats was 65 cents per bushel, which was less than the contract price of 67 cents per bushel, and plaintiff could have bought in the oats at no loss to itself. Having failed to buy in the oats as required by Rule 10, Quaker would be in no position now to recover damages against Brinkley.[1]

Conclusions of Law

1.

The court has jurisdiction of the parties and the subject matter herein.

---

1. Of course, where the parties are not bound by the rules of the Association, the purchaser is not required to buy in the oats upon notice that the seller will not perform. Ordinarily, the buyer may wait until the last day for performance and

his measure of damages is the difference between the market price on said date and the contract price. Reliance Cooperage Corp. v. Treat, 8 Cir., 195 F.2d 977; Continental Grain Co. v. Simpson Feed Co., D.C.E.D.Ark., 102 F.Supp. 354.

**2.**

There was never any meeting of the minds of the parties and no valid contract was entered into between plaintiff, The Quaker Oats Company, and the defendant, Brinkley Dryer & Storage Company, Inc.

**3.**

Plaintiff is entitled to recover nothing of and from the defendant, and plaintiff's complaint should be dismissed.

A judgment in accordance with the above should be entered.