**CARGILL, INC., Plaintiff,**

v.

**ATKINS FARMS, INC. and F. K. Bradshaw, Defendants.**

**No. ED 74–69–C.**

United States District Court, W. D. Arkansas, El Dorado Division.

Oct. 28, 1976.

Martin G. Gilbert, Coleman, Gantt, Ramsay & Cox, Pine Bluff, Ark., for plaintiff.

Bill R. Holloway, Holloway & Haddock, Lake Village, Ark., for defendants.

## MEMORANDUM OPINION

OREN HARRIS, District Judge.

In this diversity action, the plaintiff, Cargill, Inc., seeks damages for an alleged breach of contract against the defendants, Atkins Farms, Inc. and F. K. Bradshaw. The plaintiff is a corporation organized under the laws of a state other than Arkansas with its principal place of business in Minneapolis, Minnesota. The defendant, Atkins Farms, Inc., is a corporation, organized under Arkansas law with its principal place of business in Hamburg, Arkansas. The defendant, F. K. Bradshaw, is a citizen and resident of Hamburg, Arkansas. The amount in controversy exceeds $10,000.00. exclusive of interest and costs. Jurisdiction is admitted and established pursuant to 28 U.S.C. § 1332.

There is little dispute as to the material facts which gave rise to this controversy. There are two contracts between the parties upon which the claim of the plaintiff is based.

First, the plaintiff, Cargill, Inc., and the defendants, Atkins Farms, Inc. and F. K. Bradshaw, entered into a contract, on July 16, 1974, which, by its terms, Atkins and Bradshaw sold and agreed to deliver to Cargill 25,000 bushels of # 1 yellow soybeans, for which Cargill agreed to pay the defendants $6.74 per bushel. The contract was on Cargill standard printed forms with delivery (time of shipment) due July 31, 1974. The contract provided that Cargill, as processor, reserved the right to refuse over 14.5 MST and 8% DMG.[1]

---

1. Although the contract specified F. K. Bradshaw & Son & Etta, it is understood by the parties and agreed that F. K. Bradshaw & Son is the name under which the defendant, F. K. Bradshaw, does business. The father, F. K. Bradshaw, Sr., is deceased and Etta (Ella) refers to Bradshaw's mother who had a small quantity of beans (2,000 bushels). The parties' agreed that Ella Bradshaw had delivered her 2,000 bushels and, therefore, is not a party to this action. Further, it was provided that delivery would be made by the defendants to the Yellow Bend elevators of Cargill by truck.

On the same date, July 16, 1974, the plaintiff, Cargill, Inc., and the defendant, Atkins Farms, Inc., entered into a similar contract which was identical in all respects except Atkins agreed to deliver to Cargill 10,000 bushels of # 1 yellow soybeans for which Cargill agreed to pay $6.74 per bushel.

It is undisputed and established by the record that all parties understood that, as a part of the contract, the provision "Processor Scale of Discounts" referred to the practice prevalent in the industry whereby the processor, Cargill, upon tender of a truckload of soybeans, would inspect and grade a sample of the truckload and, based upon the results of such inspection and grading, make certain deductions from the contract price. The standard discounts applied by Cargill during 1974, as well as the previous year, 1973, was included as evidence in the record by the plaintiff. Discounts acceptable were made from the contract price in accordance with this standard of discounts depending upon such factors as test weight, moisture, heat damage and other damage revealed by the inspection and grading of the sample.

Similarly, it is established that the parties understood that 14.5 MST, as included in the contracts, referred to 14.5% moisture and that DMG referred to damage.

Pursuant to the contract, the defendants, Atkins Farms and Bradshaw, commenced the trucking of soybeans to Cargill's Yellow Bend elevator on July 18, 1974. Five truckloads were delivered on that date. On Friday, July 19, 11 truckloads were delivered and on Monday, July 22, 9 truckloads were delivered, making a total of 11,896 bushels delivered by the defendants.

When the last truckload of soybeans was delivered, late afternoon, Monday, July 22, Fred Cooper, Cargill's superintendent of the elevator, advised the driver of the truck not to deliver any more soybeans until he, Cooper, talked to Mr. Atkins of Atkins Farms or Mr. Bradshaw.

The testimony on just what happened at this time is in conflict. Mr. Cooper testified that he had become concerned about the level of damage in the samples being inspected as the trucks arrived. Since the grading of damage was largely a judgment matter, he wanted to have some of the samples graded by the Mississippi State grader to determine whether his grading was too strict. It was a custom, and established as regular procedure, that soybeans, upon being barged out from the Yellow Bend elevator of the plaintiff, are inspected and graded by the Mississippi State grader. According to Cooper's testimony, he had become superintendent of the Yellow Bend elevator as of July 1, 1974, having been previously a foreman at Cargill's New Madrid, Missouri, elevator, and he wanted to see how the Mississippi State grader would grade some of the samples. He stated that if he found that he was grading the soybeans more strictly than they would be graded by the Mississippi State grader, upon being barged out, he would relax his grading accordingly.

The level of damages was important because all of the beans from the Yellow Bend elevator were being barged to Baton Rouge, Louisiana. From there, they would ultimately be exported. Federal regulations prohibited the exporting of soybeans with over 3.0% damage. Therefore, any quantity of soybeans having over 3.0% damage would, of necessity, have to be mixed with a sufficient quantity of soybeans with less than 3.0% damage in order to comply with the regulations. It was explained by the plaintiff's witnesses that this was the reason for including the provision in the contracts that gave Cargill the right to refuse over 8.0% damage. If a given quantity of soybeans showed damage over 8.0%, the processor, Cargill, would evaluate the soybean market and supply situation at the time and make a judgment as to whether or not to accept the beans.

Mr. Cooper testified that he talked, by telephone, with Mr. Bradshaw late the afternoon that he had advised the truck driv-

er not to deliver any more beans until he had discussed it with the defendants. He advised Bradshaw that he was concerned about the level of damage of the soybeans and that he wanted to have some samples checked by the Mississippi State grader. He stated that Bradshaw offered no objection to temporarily suspending the hauling until that could be done. Further, he stated that Bradshaw explained that he had some irrigation work that the men could be doing in the meantime.

The driver of the last truck delivery, on Monday, July 22, testified that Mr. Cooper, the superintendent of the plaintiff, told him to not deliver any more of the defendants' soybeans. Mr. Bradshaw testified that he objected to the temporary suspension of the hauling for the above stated reason but admitted that he did not protest and, in fact, went along with Cooper's request.

Superintendent Cooper immediately called the Mississippi State grader; he responded by coming to the Yellow Bend elevator the next day, Tuesday, July 23, and inspected three (3) of the defendants' samples of beans for damage. On the first sample, the Mississippi State grader assigned 17.0% damage with no significant heat damage. This compared with Cooper's grading of 6.9% damage and 1.0% heat damage. On the second sample, the Mississippi State grader found 20.8% damage with no significant heat damage, whereas Cooper had assigned 6.8% damage and 1.9% heat damage. On the third sample, the Mississippi State grader assigned 14.7% damage and no heat damage, as compared to Cooper's grading of 8.0% damage and 1.8% heat damage.[2]

On Tuesday afternoon, July 23, Mr. Cooper called both Mr. Atkins and Mr. Bradshaw and reported to them the results of the Mississippi State grader's inspection for one of the samples which showed 14.7%

damage. He did not receive the results of grading by the Mississippi State grader on the other two samples until the morning of July 24. He was told that they, Atkins and Bradshaw, also had a sample checked and that the damage was not that bad. Mr. Cooper inquired as to who had checked the sample; they refused to reveal the information.

On the same day, Tuesday, July 23, that the Mississippi State grader visited the Yellow Bend elevator, the evidence revealed that Messrs. Atkins and Bradshaw delivered a truckload of soybeans to Riverside Soybean Corporation, which assigned a total damage of 17.4%. The evidence failed to show whether it included any heat damage. Apparently, Atkins and Bradshaw made no effort to obtain any information as to the samples graded by anyone other than Riverside. At this time, Cooper offered to submit samples from their beans to any licensed inspector they might select. They failed to accept the suggestion and, in fact, displayed no interest in doing so.

The following day, July 24, Messrs. Atkins and Bradshaw met with Mr. Cooper in his office at the Yellow Bend elevator. They advised him that, since the damage was running over 8.0%, they considered the contracts no longer binding. They also requested at this time payment for the soybeans which had already been delivered.

It was the custom that payment for soybeans delivered to the Yellow Bend elevator be made in one of two ways. Either the seller could request payment for each truckload delivered, or he could ask that payment be held up until requested. In this instance, payment was made by check out of Cargill's Memphis Office and required that the truck tickets, for which payment was requested, be mailed to Memphis where they would be processed and the checks mailed to the customer. Initially, Atkins

2. The above assigned damage from the three samples inspected by the Miss. State grader are reflected on plaintiff's exhibits 4g, 4r and 4w. It appears the reference "Miss. State graded 17.0% DMG; 20.8% DMG; and 14.7% DMG"

refers to moisture content with no heat damage. The reserve right of plaintiff to refuse under the contract states ". . . over 14.5% MST and 8.0% DMG."

and Bradshaw had requested their checks not be made and delivered until requested.[3]

At their meeting on Wednesday, July 24, Mr. Cooper told Messrs. Atkins and Bradshaw that Cargill wanted, and expected, the soybeans to be delivered under the contracts. They advised him that they would discuss further delivery after they had been paid for the beans that had already been delivered.

Mr. Cooper informed them that it would be necessary for him to check with the Cargill office at Baton Rouge to see whether they would get paid for the beans already delivered in view of their statement that the contracts were no longer binding and their refusal to discuss further delivery at that time.

There was some difference in the testimony of Messrs. Atkins and Bradshaw from the version given by Mr. Cooper. Their testimony was that Cooper frankly told them that they would not be paid for the soybeans already delivered in view of their refusal to continue the delivering of soybeans on the basis that the damage, as shown by the samples, amounted to more than 8.0%. They did not feel that they were further bound by the terms of the contract.

Nevertheless, it was established by the testimony that Cooper advised them the following day, July 25, that they would be paid as soon as the checks could be made available and, further, the record discloses that they were paid in full for the beans delivered within five (5) days of the initial request. The testimony revealed that the payments from Cargill were delivered to them on Friday and Saturday, July 26 and 27. The final payment was delivered to them by Mr. Cooper on Monday, July 29.

The testimony in the case further revealed that at their meeting, July 24, both Mr. Atkins and Mr. Bradshaw expressed to Mr. Cooper their dissatisfaction with the Cargill discount standard contending that it was too high, although the standard used as to their beans was the same as used by Cargill at the Yellow Bend elevator since 1973 and, in fact, the same standard in use on the date of the trial, April 1, 1976. Even so, Mr. Cooper testified that he offered to try to obtain authority to lower the discount standard for them as to beans to be delivered under the existing contracts.

On Monday, July 29, Mr. Cooper, on behalf of Cargill, went out to obtain samples from the bins from the remaining soybeans in order to determine the extent of damage, if any. While obtaining the samples, he offered the defendants a proposed lowered discount scale. They advised him that they would discuss it and let him know later. However, this was the last direct contact between Mr. Cooper and either Mr. Atkins or Mr. Bradshaw. Mr. Cooper did attempt to talk to both of them, Atkins and Bradshaw, by telephone but neither of them returned his call nor did either of them ever contact him again.

It should be noted, and it is undisputed, that Mr. Atkins did not deliver any of the beans pursuant to the second contact between the plaintiff, Cargill, Inc., and the defendant, Atkins Farms, Inc., wherein he was to deliver to Cargill 10,000 bushels of soybeans.

It is also established that the defendants, Atkins Farms, Inc. and F. K. Bradshaw, commenced hauling their soybeans to Riverside Soybean Corporation on August 1, 1974, and continued such delivery until all of their remaining soybeans were delivered to the processor, Riverside.

On August 2, 1974, the credit manager of Cargill, Inc. wrote both Messrs. Atkins and Bradshaw demanding delivery of the beans pursuant to the terms of the contracts and offered to extend the contracts fifteen (15) days to permit the delivery if they would respond favorably by August 6. In response to the letters from Cargill's credit manager, an attorney for Atkins and Bradshaw wrote the plaintiff, Cargill, Inc., advising that they considered the contracts breached on July 22 by Cargill and that they did not consider themselves responsible

---

3. The words "hold check" are included on the delivery tickets exhibits 4a-y, inclusive.

for any further deliveries under the contracts. Subsequently, Cargill cancelled the contracts and this action followed.

It was stipulated by the parties that the Chicago Board of Trade market price for soybeans increased steadily from $6.80½ on July 16, 1974, to $8.95 on July 31, 1974. During this period of time, the price for soybeans delivered at the Cargill Yellow Bend elevator ranged from five to fifteen cents below the Chicago price depending upon various factors, including negotiation of the parties. Further, the price at which defendants, Atkins and Bradshaw, sold their soybeans to Riverside ranged from $7.42 to $8.87, with most of the soybeans bringing $8.60, and above.

The plaintiff, Cargill, Inc., is seeking damages against the defendants, Atkins Farms, Inc. and F. K. Bradshaw, for their failure to deliver soybeans pursuant to the terms of the contracts, 25,000 bushels by Atkins and Bradshaw jointly, and 10,000 bushels by Atkins Farms, Inc. in the second contract.

It is undisputed that only 11,896 bushels of soybeans were delivered under the first contract by Atkins Farms, Inc. and F. K. Bradshaw, and, as noted herein, no soybeans were delivered under the Atkins' contract. Both Messrs. Atkins and Bradshaw contend that they were relieved from further performance of the contracts on the basis that the contracts were no longer binding since the damage exceeded 8.0% and, furthermore, because Cargill, Inc. breached the contract by requiring them to suspend hauling on July 22, 1974.

In their counterclaim, defendants, Atkins and Bradshaw, allege that the damage discount standard applied by Cargill was excessive and above that reasonably and normally applied in the business and was in excess of that agreed upon by the parties at the time of contracting.

There are two primary questions for determination of the Court in this proceeding:

(1) Was the plaintiff guilty of a substantial breach of the contracts by temporarily suspending delivery, when the last truckload was delivered on Monday, July 22, which relieved the defendants from performance of the contracts?

(2) Were the defendants justified in breaching their contracts under the reservation clause, if inspection and grading of beans showed damages over 8.0%?

■ As to the first question, it is well established law that, if there is substantial evidence in the record tending to establish a material breach of the contract on the part of the plaintiff, the defendant would be justified in refusing further performance. *Duncan v. Montgomery Ward & Co.,* 8 Cir., 108 F.2d 848; *Jones v. United States,* 8 Cir., 112 F.2d 282; *Johnson et al. v. J. H. Yost Lumber Co., et al.,* 8 Cir., 117 F.2d 53; *Brinegar v. Green,* 8 Cir., 117 F.2d 316; *Coen v. American Surety Co.,* 8 Cir., 120 F.2d 393; *Long v. Clinton Aviation Co.,* 10 Cir., 180 F.2d 665. On the other hand, if there is no substantial evidence to that effect, the defendants would not be justified in refusing further performance of the contracts. *Dustin Grain Co. v. McAllister,* 8 Cir., 296 F. 611.

A similar case was decided by this Court, Lemley, J., on December 17, 1951, *Continental Grain Co. v. Simpson Feed Co.,* 102 F.Supp. 354, affirmed by our Eighth Circuit Court of Appeals on October 28, 1952, *Simpson Feed Co. v. Continental Grain Co.,* 199 F.2d 284. There, the plain question of fact concerned a 48 hour delay in furnishing shipping instructions which the defendant Simpson claimed was a substantial breach of the contract that justified it in refusing further performance. *Continental Grain Co.,* supra, 102 F.Supp. 354.

■ In the instant proceeding, Mr. Cooper, plaintiff's superintendent, suspended further delivery with the last load on Monday afternoon, July 22, and, within 48 hours, on July 24, 1974, at a meeting with Messrs. Atkins and Bradshaw, in Cargill's office at its Yellow Bend elevator, Cooper informed them that Cargill wanted, and expected, the soybeans to be delivered pursuant to the terms of the contracts.

Their response was that they would discuss further delivery after they had been

paid for the beans already delivered. They received payments for the delivered beans on July 26, 27 and 29.

During their meeting with Cooper, on July 24, 1974, at Cargill's office, Messrs. Atkins and Bradshaw expressed dissatisfaction with the "discount scale". The contracts included a provision for a discount scale, depending upon the condition of the beans at the time of delivery, which had been in effect continuously since 1973. Nevertheless, Cooper, as Cargill's representative, suggested that the discount scale be lowered as applicable to the contracts in question.

Finally, the defendants advised Cargill's superintendent that, since the damage, shown from inspection of the samples, was running over 8.0%, they considered the contracts no longer binding. On Monday, July 29, when superintendent Cooper went to the defendants' bins for the purpose of obtaining samples, he delivered a proposed lowered discount scale and was informed by them that they would discuss it and let him know. There was no further contact between the parties and no further delivery by the defendants. The due date of the delivery was July 31, 1974, which the plaintiff offered to extend for fifteen (15) days to permit delivery under the contracts.

Although it appears that the parties contemplated that deliveries were to be made from day to day, after the effective date of the contracts, all deliveries were due to be made by the defendants by July 31, 1974. No particular date in the interim or other dates were specified. The defendants had the right to tender all the beans, either on several days in the interim or by the last day of the contract period.

There is no suggestion that the plaintiff's delay of the delivery of beans for 48 hours manifested any inability on its part to perform its contractual obligations or that it evidenced any intent on its part to repudiate the contract or to abandon further performance under it. In fact, the plaintiff ultimately advised the defendants, by letter, that they were expected to deliver the beans as provided by the contracts.

The Court can only conclude that the defendants sustained no substantial damage as a result of the two days' delay; nor did they run the risk of future damage. The marked rise in the price of soybeans gave the defendants a considerable margin of safety had the market begun to fall, which it did not do.

Further, the Court concludes on this issue that no showing has been made that the plaintiff's delay was either willful or negligent. Assuming the statement of the defendants' truck driver on the last delivery is correct, that Mr. Cooper told him that the defendants were not to deliver any more of their beans, the subsequent facts render the testimony of Mr. Cooper credible. He immediately, that same evening, July 22, 1974, contacted the defendants. The Mississippi State grader came the next day. From three samples of the defendants' beans, the Mississippi State grader provided the results from one of the samples that day and the other two the following day. Subsequently, on the same day, July 24, 1974, he met with defendants, Atkins and Bradshaw. In the interim, he was trying to determine if his sample grading would conform to that of the Mississippi State grader.

Under such circumstances, the Court does not feel that any reasonable person, in the exercise of fair and impartial judgment, could conclude that the plaintiff's delay was such a substantial breach as to justify the defendants in failing to perform under the terms of the contracts. *Continental Grain Co.*, supra, 102 F.Supp. 354, 359–360.

In *Simpson Feed Co. v. Continental Grain Co.*, supra, the Eighth Circuit Court of Appeals adopted the opinion of the District Court, 102 F.Supp. 354, and stated further:

"The question whether the plaintiff's delay in furnishing shipping instructions was a substantial breach of the contract, we think, was not a question of fact for the jury under the evidence. The rule is that where the evidence is so overwhelmingly on one side as to leave no room to doubt what the fact is, the court should give a peremptory instruction to the jury.

*Gunning v. Cooley,* 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720. It seems obvious to us, as it did to the District Court, that the plaintiff's delay in furnishing shipping instructions was of no serious or prejudicial consequence to the defendant, but was seized upon by it as an excuse for refusing to furnish the plaintiff with the beans at the contract price which was much lower than the market price which prevailed at the time the delay occurred. Had the jury returned a verdict for the defendant, we think it would have been the court's duty to set it aside." 199 F.2d at page 286.

In the opinion of the Court, the plaintiff's delay, for a comparative sampling of the beans, for a period of 48 hours was of no serious or prejudicial consequence to the defendants and cannot be construed as a substantial breach of the contracts which relieved the defendants from performance of their obligation as provided by the contracts.

As to the second question, the contracts made it clear that the plaintiff, Cargill, Inc., had the right to refuse any soybeans having over 8.0% damage. As stated by counsel for the plaintiff, the Uniform Commercial Code provides that the plaintiff, Cargill, had the right to inspect the beans, both those delivered and those remaining in the bins to be delivered, "at any reasonable place and time and in any reasonable manner." Ark.Stats.Ann. § 85–2–513 (1961 Add.).

■ There can be no question from the evidence in the case that Cargill had the right to a reasonable opportunity to confirm whether the soybeans were running over 8.0% damage and to determine whether to accept or reject the soybeans should it be determined, from proper inspection and sampling, there was, as established, over 8.0% damage. The evidence fails to establish, by the testimony, or even inferences, that the defendants could, by any construction, arrive at the decision that, because their soybean samples were running over 8.0% damage, they were justified in breaching of the contracts or that they were justified in being relieved from performance under the terms of the contracts.

It is quite evident, from all the testimony in the case, including exhibits and the entire record, that the defendants "seized" upon the excuses for refusing to furnish the plaintiff with the beans at the contract price, which was much lower than the market price which prevailed at the time the contracts were to be performed by the parties.

It is stipulated by the parties that the market price on July 31, 1974, the due date for delivery of the beans, pursuant to the terms of the contract, was substantially increased from what it was on July 16, 1974, the date of the contracts.

The Court can only conclude, as a matter of law, that the defendants claimed right in breaching of the contracts under the reservation clause, is without merit and must fail.

■ The defendants, in their counterclaim, contend that the "damage discount scale" used by Cargill at its Yellow Bend elevator was excessive and above that reasonably and normally applied in the business. As already noted, the evidence established that the discount scale used by the plaintiff at its Yellow Bend elevator since 1973 was posted throughout the period of time on the premises of the plaintiff. No evidence was presented to the Court which suggested the discount scale applied by other soybean processors in the area; not even the discount scale used by Riverside, to whom the defendants delivered their beans after the breach of the contracts, was revealed. There was some testimony that the one truckload delivered to Riverside on July 23, 1974, showed less discount for damage and other factors than would have resulted had it been delivered to Cargill. But the testimony failed to establish what the Riverside scale was then or at any other time. The counterclaim is not supported by evidence and, therefore, fails for the lack of substantial evidence.

The Court having concluded that the contracts between the parties were valid and

binding in accordance with the terms, as provided by the contracts, and that the plaintiff did not substantially breach the contracts by the 48 hour delay to compare sampling and, further, that the defendants, Atkins Farms, Inc. and F. K. Bradshaw, were not justified in failing to perform under the contracts, it becomes necessary to determine the proper measure of damages.

The contracts between the parties were entered into on July 16, 1974. Pursuant to Contract No. 95737, the defendants, Atkins Farms, Inc. and F. K. Bradshaw, agreed to deliver to the plaintiff, Cargill, Inc., 25,000 bushels of # 1 yellow soybeans at an agreed price of $6.74 per bushel. Pursuant to Contract No. 95738, identical in all respects to the first contract except, Atkins Farms, Inc. agreed to deliver 10,000 bushels of # 1 yellow soybeans at the agreed price of $6.74 per bushel.

It is admitted and established that, under the Atkins and Bradshaw contract, 11,896 bushels of soybeans were delivered to the plaintiff. At the time the defendants breached the contract (No. 95737), there was a total of 13,104 bushels of soybeans undelivered. It is also admitted and established that no soybeans were delivered under the individual contract between Cargill, Inc. and Atkins Farms, Inc. Therefore, at the time of the breach of the contract (No. 95738), Atkins was to have delivered 10,000 bushels in accordance with the contract.

Under the Uniform Commercial Code, Cargill's measure of damage for nondelivery, in accordance with the contracts, by Atkins Farms, Inc. and F. K, Bradshaw and Atkins Farms, Inc. is a difference between the market price at the place of delivery at the time Cargill learned of the breach and the contract price. Ark.Stats.Ann. § 85–2–713 (1961 Add.).

■ Pursuant to the terms of both contracts, the date for delivery was July 31, 1974. Since the plaintiff, Cargill, Inc., did not, previous to that date, learn of the decision of the defendants to breach the contracts, July 31, 1974, would be the proper date to be used for computation of dam-

ages. *Simpson v. Continental Grain Co.,* supra, 199 F.2d at page 286.

■ On July 31, 1974, the Chicago Market Price for soybeans was $8.95 per bushel. The price at Yellow Bend ranged from $0.5 to $0.15 below the Chicago Market Price. Granting to the defendants, Atkins Farms, Inc. and F. K. Bradshaw, the benefit of the doubt, the price at Yellow Bend, on July 31, 1974, was $8.80 per bushel. The difference between the price at Yellow Bend on that date and the contract price of $6.74 is $2.06 per bushel.

It is, therefore, the opinion of the Court that Cargill, Inc. is entitled to damages against Atkins Farms, Inc. and F. K. Bradshaw for the breach of contract No. 95737 in the amount of $26,994.24 (13,104 bushels times $2.06 per bushel), and Cargill is entitled to damages against Atkins Farms, Inc. for breach of contract No. 95738 in the amount of $20,600.00 (10,000 bushels times $2.06 per bushel).

The Court incorporates in this memorandum opinion findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

Counsel for the plaintiff, Cargill, Inc., will prepare appropriate judgment in accordance with this opinion.