**UNITED STATES of America ex rel. E. C. ERNST, INC., and E. C. Ernst, Inc., on its own behalf, Plaintiff,**

v.

**CURTIS T. BEDWELL & SONS, INC., and United States Fidelity and Guaranty Company, Defendants.**

Civ. A. No. 79–4624.

United States District Court,
E. D. Pennsylvania.

Feb. 2, 1981.

Stephen J. Springer, of LaBrum & Doak, Philadelphia, Pa., for plaintiff.

Kenneth M. Cushman, Robert A. Prentice and Steven D. McLamb, of Pepper, Hamil-ton & Scheetz, Philadelphia, Pa., for defendants.

## OPINION

### I. Introduction

JOSEPH S. LORD, III, Chief Judge.

This is a Miller Act case. 40 U.S.C. § 270a *et seq.* Defendant Bedwell is the general contractor on a construction project. Plaintiff was its electrical subcontractor. In Count I of its complaint, plaintiff seeks $249,960.56 in damages which allegedly resulted from Bedwell's refusal to pay for services and materials furnished to Bedwell. In Counts II and III of its complaint, plaintiff seeks to recover in excess of $50,000 in damages which allegedly were the natural consequence of Bedwell's material breach of this subcontract. This sum includes loss of profits, the cost of demobilization, unbilled services, and other damages. Bedwell denies that it failed to pay plaintiff what plaintiff was entitled to receive under the contract. Furthermore, Bedwell avers that plaintiff materially breached the subcontract when it, *inter alia*, (a) failed to pay plaintiff's bills of its suppliers and materialmen, (b) went insolvent, and (c) failed to furnish performance and payment bonds. Bedwell therefore argues that it lawfully terminated the subcontract.

Bedwell has counterclaimed for the damages it suffered as the result of plaintiff's alleged material breach of the subcontract. Bedwell seeks damages in an amount in excess of $200,000 for this breach. Plaintiff's defense to Bedwell's counterclaim is that Bedwell's earlier material breach of the contract—the breach that comprises the nucleus of its initial complaint—excused plaintiff from adhering to its contractual obligations. Plaintiff also asserts that Bedwell prevented it from performing its contractual obligations.

Each party has filed a motion for summary judgment. The defendants' joint motion for summary judgment against plaintiff as to all counts of plaintiff's complaint raises one issue: did Bedwell properly and lawfully terminate its subcontract

with plaintiff?[1] For the reasons which follow, I have concluded that there is a material issue of fact as to whether Bedwell was in breach before it terminated the subcontract. I shall therefore deny defendants' motion.

Plaintiff moves for partial summary judgment with regard to Count I of Bedwell's counterclaim. It contends that Bedwell's damages were strictly limited by the contract. I shall deny plaintiff's motion.

## II. Facts

On December 19, 1977, Bedwell contracted with the United States Department of the Navy, Naval Facilities Engineering Command, for the construction of a Propeller Facility at the Philadelphia Naval Shipyard. Bedwell then entered into a subcontract with plaintiff for the performance of the electrical work. This subcontract, dated January 3, 1978, provided that Bedwell could request payment and performance bonds from plaintiff.[2] Bedwell did not request a bond when the parties executed the subcontract; nor did it request one when plaintiff began performance in February, 1978. However, in the fall of 1978—after the project was substantially underway— Bedwell learned that plaintiff's accounts with its suppliers and materialmen were in arrears. Affidavit of Curtis T. Bedwell. Consequently,[3] on October 24, 1978, it requested that plaintiff furnish the necessary bonds. The overall subcontract project was more than fifty percent complete at this point. Affidavit of Robert L. Shreves, ¶ 18.

On November 22, 1978, plaintiff notified Bedwell that it was unable to obtain the bonds at that time from its bonding company. Bedwell orally repeated its request for bonds in December, 1978. Deposition of Gerald Benson at 22.[4] Again plaintiff failed to provide the requested bonds.

In early December, 1978, plaintiff filed a Petition for Arrangement pursuant to Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq. By this time, plaintiff's past due supplier and materialmen accounts totalled over $130,000. Finally, on December 27, 1978, Bedwell gave plaintiff forty-eight hours written notice of termination.[5] It was only at this point that plaintiff ceased construction on the project.

At the time Bedwell terminated its subcontract with plaintiff, it had paid plaintiff $351,661.96 out of the total subcontract cost of $853,000. After plaintiff ceased construction on the project, Bedwell retained sixteen other subcontractors to complete the electrical work covered by plaintiff's subcontract. The subcontractors satisfactorily finished the work in November, 1979, charging Bedwell approximately $580,000.

## III. Defendants' Joint Motion for Summary Judgment

### A. Preliminary Statement

Defendants argue that Bedwell lawfully terminated the subcontract because plaintiff materially breached the terms of the subcontract: (a) when it failed to furnish the bond; or (b) when it filed a Petition for

1. Assuming *arguendo* that Bedwell did justifiably terminate the contract, Bedwell may nevertheless be liable to plaintiff under the equitable doctrines of unjust enrichment or quasi-contractual recovery. *See* Complaint, Count IV. Plaintiff claims that even if Bedwell properly terminated the subcontract, it is entitled to damages of approximately $100,000. However, defendants correctly note that these issues are not material to the present motion.

2. Article 6 of the subcontract provides in pertinent part: "Subcontractor [plaintiff] agrees, if requested by Contractor [defendant Bedwell], to furnish acceptable Performance and Payment Bonds to Contractor."

3. Under the Miller Act, general contractors and their sureties are liable to their subcontractors' materialmen and suppliers if the subcontrac-

tors default on their obligations. 40 U.S.C. § 270b(a).

4. Plaintiff denies that this conversation took place. Answer of Plaintiff, E. C. Ernst, Inc., to Defendants' Motion for Summary Judgment at 2. However, this denial is insufficient because an adverse party may not rest upon the denials of his briefs. Fed.R.Civ.P. 56(e). *See, e. g., Bryson v. United States,* C.A. No. 77–3367, slip op. at 5 (E.D.Pa. Jan. 26, 1981).

5. Article 10 of the subcontract provides that upon the default of the subcontractor, "[c]ontractor shall have the right, after 48 hours written notice to Subcontractor or to anyone representing Subcontractor in the performance of Work, to terminate this Subcontract in whole or in part ...." *See* page 16 *infra.*

Arrangement; or (c) when it failed to pay bills for labor and material as they became due. In order to grant summary judgment in defendants' favor it is only necessary to conclude that defendants have "show[n] that there is no genuine issue as to any material fact and that [they are] entitled to a judgment as a matter of law," Fed.R. Civ.P. 56(c), with respect to any one of these three contentions. Defendants have not met this burden, for there remains a controverted material fact: did Bedwell breach the subcontract by refusing to make prompt progress payments to plaintiff. I shall therefore deny the defendants' motion for all the relief asked. However, if Bedwell prevails on this disputed issue at trial, I hold as a matter of law that plaintiff materially breached the subcontract when it filed a Petition for Arrangement.[6] I have adjudicated this latter issue pursuant to the command of Fed.R.Civ.P. 56(d); in this case I can "practicabl[y] ascertain that this material fact[ ] [plaintiff's breach] exist[s] without substantial controversy." Fed.R. Civ.P. 56(d). I can narrow and thereby simplify the issues for trial.

### B. Discussion

#### 1. Bedwell's breach of the subcontract

 Plaintiff avers that it "repeatedly made demands upon defendant, Bedwell, for progress payments due and owing as per the terms of [the] contract, which defendant refused to pay, thereby materially breaching the contract." Complaint, ¶ 12. Plaintiff therefore argues that there are genuine issues of material fact as to whether and when Bedwell defaulted under the terms of the subcontract. I conclude that there is a "substantial controversy," see Fed.R.Civ.P. 56(d), as to whether Bedwell breached the subcontract before plaintiff's "breach." This precludes granting summary judgment in Bedwell's favor. If Bedwell "withheld the payment of [a progress payment] unconditionally owed to the [p]laintiff ... such conduct would constitute a breach of a material provision of the contract between the parties, thereby excusing

[p]laintiff from further performance..." *United States ex rel. Micro-King Co. v. Community Science Technology, Inc.*, 574 F.2d 1292, 1295 n.3 (5th Cir. 1978). *See, e. g., Cargill, Inc. v. Atkins Farms, Inc.*, 422 F.Supp. 239, 244 (W.D.Ark.1976) (citing cases). A defaulting party to a contract (Bedwell) cannot demand subsequent adherence to the terms of the contract by the other party (plaintiff). Therefore plaintiff's failure *later* to conform to its contractual obligations would not undermine its cause of action against the defendants.

The subcontract conditioned payment of plaintiff's invoices to Bedwell upon the payment of such by the Navy. Article 5 of the subcontract states:

> In the absence of other provisions in the Contract Documents between the Owner [the Navy] and Contractor [Bedwell] progress payments, retained percentage and final payment to the Subcontractor [plaintiff] shall be handled in accordance with the provisions of the Architect-Contractor Joint Recommendation No. 11 (retained percentage and final payment) dated February 13, 1974 which is attached hereto and incorporated herein as part of this subcontract agreement.

The Architect-Contractor Joint Recommendation No. 11, in turn, states: "the Owner [Navy] shall ... pay the Contractor [Bedwell] ... and the Contractor shall then pay his Subcontractor [plaintiff] for the amount of work for which he has been paid." Answer of Plaintiff, E. C. Ernst, Inc., to Defendants' Motion for Summary Judgment, Exhibit A, Architect-Contractor Joint Recommendation, ¶ 4. *See also id.* at ¶ 5 (procedure for progress payments).

Plaintiff argues that Bedwell failed to conform to this procedure. Plaintiff has supported its response to defendants' motion with the affidavit of Robert L. Shreves, the Project Manager for plaintiff in connection with the electrical subcontract. Affidavit of Robert L. Shreves, ¶¶ 1–3. This affidavit states: "[f]or the

---

6. In light of this (tentative) conclusion, I need not decide—and I express no opinion on—whether plaintiff's failure to provide a perform-ance bond or its failure to pay the bills for labor and material likewise constituted material breaches of the contract.

period from March through December, 1978, Defendant Bedwell was paid approximately $535,000.00 for work performed by Plaintiff." *Id.* at ¶ 13. However, the affidavit continues, Bedwell "without cause, persistently and repeatedly withheld progress payments due to Plaintiff for electrical work satisfactorily completed by it." *Id.* at ¶ 14.

Defendants argue that plaintiff has not demonstrated that Bedwell paid plaintiff less than the percentage amount which had been approved by the Navy. This contention, however, conflicts with Shreves's statement that Bedwell unjustifiably withheld some of plaintiff's share of the $535,000 that the Navy paid to Bedwell, thereby breaching the contract.[7] If Shreves's figure is correct,[8] Bedwell did not conform to the payment schedule and thus materially breached the contract. *Community Science Technology, supra.* There is evidence in the record that the Navy only paid Bedwell $418,476.50 for work performed by plaintiff. Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories, No. 38.[9] Such conflicting evidence emphasizes the existence of a controverted material fact. In light of this substantial controversy, granting defendants' motion for summary judgment would be inappropriate.[10]

### 2. Insolvency

■ Article 10 of the subcontract provides in relevant part: "Subcontractor agrees that if Subcontractor ... [b]ecomes bankrupt or insolvent or goes into liquidation, either voluntarily or involuntarily, or ... [m]akes a general assignment for the benefit of creditors or otherwise acknowledges insolvency" the contractor shall have the right to terminate the subcontract. The term "insolvency" is not otherwise defined in the subcontract.

Pennsylvania law defines insolvency in two ways: "In the bankruptcy sense, the test of insolvency is purely mathematical and results when the aggregate value of the debtor's property is less than his liabilities. Insolvency in the equity sense, on the other hand, is the inability to meet obligations as they mature." *Larrimer v. Feeney,* 411 Pa. 604, 607, 192 A.2d 351, 353 (1963) (citation omitted). *See Mellon Bank, N.A. v. Aetna Business Credit,* 619 F.2d 1001, 1008 (3d Cir. 1980). The litigants agree that at the time plaintiff filed its Petition for Reorganization it was insolvent in the equity sense only. However, plaintiff argues that the contracting parties limited the term, "insolvency," to its bankruptcy sense. Yet, the clause—"if subcontractor ... [b]ecomes bankrupt *or* insolvent" (emphasis added)—differentiates between "bankrupt[cy]" and "insolven[cy]." This clearly demonstrates that insolvency is a criterion separate from bankruptcy for determining whether plaintiff has defaulted. Therefore "insolvency" must be read in its "equity sense."

Were I to agree with plaintiff, the additional words, "or insolvent," would be unnecessary surplusage. I will not torture the plain meaning of this subcontract to reach such an interpretation. "In a written contract the intent of parties is the writing itself and when the words are clear and

---

7. Plaintiff concedes that Bedwell paid a total of $351,661.96 for completed work. However, plaintiff sought a total of $601,622.48.

8. For purposes of this summary judgment motion, I have assumed that Shreves is competent to testify as to the amounts the Navy paid Bedwell for construction relating to the electrical subcontract. *See* Fed.R.Civ.P. 56(e). Defendants have not challenged Shreves's affidavit on this ground.

9. This figure is greater than the $351,661.96 that was actually paid to plaintiff. Therefore, even if Bedwell's figures are correct, plaintiff may still have been underpaid; on the other hand, the difference may be due wholly to Bed-

well's profit. I express no opinion on this issue, for it is not critical to the present motion.

10. Defendants argue that even if Shreves's figures are accepted, Bedwell's failure to pay all sums due plaintiff did not affect plaintiff's ability to pay its suppliers and materialmen. Therefore, defendants conclude, plaintiff's breach of the contract was not caused by defendants' supposed breach. This argument is fallacious, for it fails to consider that a material breach of a contract—the failure to make timely progress payments—excuses the other party's further performance. Otherwise, cash—rich subcontractors would be at the mercy of contractors who did not reimburse them for completed work.

unambiguous the intent is to be determined only from the express language of the agreement." *Robert F. Felte, Inc. v. White,* 451 Pa. 137, 143, 302 A.2d 347, 351 (1973) (citing cases).

■ I therefore hold that, assuming Bedwell did not breach the contract earlier, *see* pages 1327–1328 *supra*, plaintiff defaulted on December 1, 1978, pursuant to Article 10(e) of the subcontract, when it filed its Petition for Reorganization; moreover, since the petition states that plaintiff was "unable to pay its debts as they mature," *see* Motion of Defendants, Curtis T. Bedwell & Sons, Inc. and United States Fidelity and Guaranty Company, for Summary Judgment at Exhibit G, plaintiff also defaulted pursuant to Article 10(g), for by filing the petition it thereby "acknowledged" its insolvency.

■ This result is especially compelling in light of a contractor's extraordinary obligations under the Miller Act, for

> [a]ny person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with a contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made . . . .

40 U.S.C. § 270b(a).[11] Therefore plaintiff's inability to pay its debts as they matured— its insolvency in the equity sense—precipitated the rights of its unpaid materialmen and suppliers to look to Bedwell and its surety, United States Fidelity and Guaranty Co., for payment. If Bedwell were unable to terminate the contract under such circumstances, it would be forced to sit idly by and watch its potential liability to plain-

tiff's suppliers increase without any way to protect itself short of breaching the subcontract.

### 3. Waiver

Plaintiff contends further that even if insolvency is interpreted in its equity sense, there are genuine issues of material fact as to whether Bedwell waived any right it may have had to declare plaintiff in default. Plaintiff promptly informed Bedwell after it filed a Petition for Arrangement on December 1, 1978. However, plaintiff continued to work on the project, with Bedwell's approval, until December 27, 1978, when Bedwell sent its termination letter. Affidavit of Robert L. Shreves, ¶ 24. The issue, then, is whether Bedwell impliedly waived[12] its contractual right when it allowed plaintiff to continue its performance on the project for twenty-seven days after it filed its Petition for Arrangement.

■ A waiver is the intentional relinquishment of a known right. *Brown v. Pittsburgh,* 409 Pa. 357, 360, 186 A.2d 399, 401 (1962) (citing cases). "[T]he doctrine of implied waiver in Pennsylvania applies only to situations involving circumstances equivalent to an estoppel, and the person claiming the waiver to prevail must show *that he was misled and prejudiced thereby.*" *Id.* at 361, 186 A.2d at 401 (emphasis in original) (citing cases). Moreover, the burden of showing such an implied waiver rests on plaintiff. *Steinman v. LaCharty Hotels Co.,* 355 Pa. 444, 447, 50 A.2d 297, 298 (1947); *Yellow Cab Co. of Philadelphia v. Carpol Realty Co.,* 221 Pa.Super. 132, 136, 289 A.2d 241, 243 (1972).

Plaintiff has not carried this burden. Its answer to the defendants' motion for summary judgment did not proffer *any facts* suggesting that it was misled *to its detriment* because of the twenty-seven day delay. The fact that plaintiff continued to

---

11. "The Miller Act represents a congressional effort to protect persons supplying labor and material for the construction of federal public buildings in lieu of the protection they might receive under state statutes with respect to the construction of nonfederal buildings. The essence of its policy is to provide a surety who, by force of the Act, must make good the obliga-

tions of a defaulting contractor to his suppliers of labor and material." *United States v. Carter,* 353 U.S. 210, 216–17, 77 S.Ct. 793, 796–97, 1 L.Ed.2d 776 (1957).

12. Plaintiff does not claim that Bedwell expressly waived its contractual right.

work on the project until December 27, 1978 did not prejudice it because there is no evidence showing that during this intervening period it contracted to purchase additional material, supplies, or tools. Indeed, there is no evidence that it entered into contracts of any sort during this time—for instance, with laborers or with sub-subcontractors.[13]

There will inevitably be some delay between the time the contractor learns of the insolvency of its subcontractor and the time when the contractor informs the subcontractor that it has terminated the contract. Absent *facts* demonstrating that plaintiff was harmed by this delay, however, I conclude that Bedwell did not impliedly waive its contractual right to terminate the contract.

### 4. Conclusion

I shall deny defendants' motion for summary judgment. However, assuming Bedwell did not breach the subcontract, *see* pages 1327–1328 *supra*, I hold that Bedwell lawfully terminated its subcontract with plaintiff on December 27, 1978.[14]

### IV. Plaintiff's Cross-Motion for Summary Judgment

### A. Preliminary Statement

Plaintiff argues that the terms of the subcontract preclude Bedwell from recovery.[15] Article 10 of the subcontract states in pertinent part:

Subcontractor agrees that if Subcontractor [defaults] ... [c]ontractor shall have the right, after 48 hours written notice to Subcontractor or to anyone representing Subcontractor in the performance of Work, to terminate this Subcontract in whole or in part, and Contractor may itself or through others provide any labor or materials necessary to complete the job and deduct the cost thereof from any money due, or thereafter to become due, to Subcontractor under this Subcontract. Contractor shall also have the right to enter on the premises, take possession of all materials, tools, and appliances thereon for the purpose of completing Work, and this Subcontract shall be construed as an assignment by Subcontractor to Contractor of said item. Subcontractor agrees to abide by Contractor's action and that such termination shall not be made the basis of any legal action to secure additional compensation or damages.

Plaintiff contends that Bedwell could deduct its cost of completion from "any money due, or thereafter to become due" to plaintiff under the subcontract, but that the subcontract did not otherwise provide or permit a right of recovery by Bedwell. Plaintiff argues that Bedwell did so deduct the cost because it never paid the more than $500,000 that would have become due under plaintiff's lump sum contract price had plaintiff completed the project. Therefore, plaintiff concludes, Bedwell has exhausted its recovery rights.

### B. Discussion

Appropriate analysis depends upon an interpretation of the last sentence of the contractual language quoted above. In particular, I must answer the question: whose remedies are being limited by that sentence? Bedwell argues that this sentence refers to the subcontractor (plaintiff) and concludes that plaintiff agreed therein not to challenge the contractor's decision to terminate upon default nor to commence legal action to recover any more than that portion of the contract price remaining after Bedwell has deducted its costs of completion.

---

**13.** Of course, even if plaintiff, and not Bedwell, breached the contract, Bedwell may be liable to plaintiff under the equitable principles of restitution or unjust enrichment for the benefit resulting from plaintiff's labor during this 27 day period. *See* note 1 *supra*.

**14.** *See* notes 1 & 13 *supra*.

**15.** For purposes of this motion only, plaintiff assumes *arguendo* that it breached the subcontract. I expressly held that this issue cannot be decided at the summary judgment stage of these proceedings. *See* pages 1327–1328 *supra*. My earlier holding, however, does not moot this motion.

I conclude that Bedwell's interpretation of Article 10 of the subcontract is correct. The language preceding this last sentence describes the rights of the contractor upon ·the subcontractor's default. However, the last sentence then states that the subcontractor agrees to such extraordinary contractual remedies even though they may limit its compensation for work completed on the project. Moreover, the subcontractor agrees not to institute suit for any damages sustained that were the proximate result of such an abrupt termination of its contract.

■ .Plaintiff's suggested interpretation is anomalous, for only the subcontractor would seek "additional compensation" in a legal action because only the subcontractor is "compensated" in the subcontract. The contractor pays its subcontractor; the subcontractor never pays its contractor. Therefore the contractor would never seek compensation—or "additional compensation." Thus the language of this last sentence can only refer to legal action instituted by the subcontractor.[16] Consequently, the subcontract does not proscribe this present action by Bedwell to recover damages resulting from plaintiff's default.

■ Plaintiff argues in the alternative that even if Bedwell can recover damages which resulted from plaintiff's breach, it cannot recover for lost overhead and profit [17] because it received the full overhead and profit allocable to electrical work on the project when the Navy paid Bedwell the full contract amount of $925,146.00. This amount included an overhead and profit margin of $72,146.00 above the $853,000.00 subcontract price. This contention is specious. Bedwell alleges that it was compelled to experience *additional* costs (overhead) and lost profits because plaintiff's default forced it to supervise completion of the project, a task it would not otherwise

have undertaken. Instead of relying on one subcontractor (plaintiff) to finish the electrical work, Bedwell had to oversee sixteen substitute subcontractors. *See* Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories, Nos. 51 & 54 (listing the total amounts paid by Bedwell to the substitute subcontractors). "[W]here ... additional time in the operation of the plant and employes is required to remedy the breach, the overhead attributable to that extra work is a proper item of damages... So too, the reasonable profit which [Bedwell] would have made on the work of these employes ... during the extra time required is a loss directly and naturally flowing from the breach." *Royal Pioneer Paper Box Manufacturing Co. v. DeJonge*, 179 Pa. Super. 155, 166, 115 A.2d 837, 842 (1955). Bedwell must therefore be given the opportunity to prove the additional costs and lost profits it experienced as a result of plaintiff's default. *Cf. Willred Co. v. Westmoreland Metal Manufacturing Co.*, 200 F.Supp. 59, 66 (E.D.Pa.1961) (the extra labor would not have been employed absent defendant's breach; held, plaintiff not entitled to make a profit out of the breach).

### C. Conclusion

Plaintiff's interpretation of Article 10 of the contract is erroneous. I shall therefore deny its cross-motion for summary judgment.

---

**16.** Even if this language referred to legal action commenced by the contractor, Bedwell would not be precluded from litigating this counterclaim. The "basis" of its present legal action to "secure ... damages" is not the "termination" of plaintiff; rather, the essential ingredient—the essence—of this lawsuit is plaintiff's default.

**17.** Bedwell seeks overhead expenses of $130,960.19 and profit of $66,937.40 as part of its cost of completing the project. *See* Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories, No. 80.