755 F.2d 932
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
TAFT A. McKINSTREY, TRUSTEE IN BANKRUPTCY FOR FRANK D.
BYRLEY, INDIVIDUALLY; FRAN, INC; FDB, INC.; AND
EDA ENTERPRISES, INC. PLAINTIFF-APPELLEE,
v.
SHAKEY'S INCORPORATED, A DELAWARE CORPORATION, DEFENDANT-APPELLANT.
 NO. 83-5733
 United States Court of Appeals, Sixth Circuit.
 1/2/85
 
 Before: ENGEL and WELLFORD, Circuit Judges; and, DeMASCIO, District Judge.*
 WELLFORD, Circuit Judge.
 
 
 1
 Plaintiff, the bankruptcy trustee of Frank Byrley, et al., brought suit against defendant, Shakey's Inc. ('Franchisor'), alleging that Franchisor had breached various franchise and management contracts. The district court refused Franchisor's motion for directed verdict and a jury returned a verdict for plaintiff. The district court then overruled Franchisor's motion for a judgment n.o.v. Franchisor now appeals the lower court's judgment claiming that its motion for directed verdict and/or for judgment n.o.v. should have been granted. For the reasons stated below, we reverse.
 
 
 2
 Plaintiff submitted a franchise application on October 1, 1971, to open a Shakey's pizza parlor in Lexington, Kentucky. Franchisor approved the application, and plaintiff opened the Lexington store on April 27, 1972. From its inception, the Lexington store did exceptionally well.
 
 
 3
 In July or August of 1973, plaintiff learned that Franchisor was interested in selling several stores in the Cincinnati area. These stores had been company run, but were unprofitable. Plaintiff took over these stores in the Cincinnati area in late 1973 and early 1974, and claims that Franchisor misrepresented their profitability.
 
 
 4
 By March 1974, plaintiff determined that the Ohio stores were incurring losses in excess of the profits his Lexington store was generating, and he met with Franchisor to discuss the possibility of closing the Ohio stores. Rather than closing the stores Franchisor proposed that plaintiff take over the management of three other Ohio stores in order to improve his cash flow. Plaintiff agreed to do this, and signed management contracts to this effect in June and August of 1974. In September 1974 he signed a franchise agreement for another store, which was located on the Ohio State University campus. By this time plaintiff owned six stores through franchise agreements and operated three others under management contracts.
 
 
 5
 In late 1974 and early 1975 plaintiff's financial situation had substantially deteriorated. Plaintiff discussed his continuing severe cash problems at Franchisor's home office. During a January 1975 meeting plaintiff asked one of Franchisor's officers if he could suspend royalty payments until the problems were worked out, and Franchisor agreed. On February 25, 1975, however, plaintiff received a letter from Franchisor's counsel, which stated that he had thirty days to cure his arrears or the franchise agreements would terminate. On March 1, 1975, Franchisor notified plaintiff that his three management contracts and six franchise agreements were being terminated because of plaintiff's insolvency.
 
 
 6
 On March 4, 1975, the Franchisor took possession of plaintiff's eight Ohio stores. This was accomplished by entering the stores, requesting the hourly employees to leave, changing the door locks, and posting armed guards and guard dogs inside the restaurants. No action was taken with respect to the Lexington store, although a March 1 letter stated the franchise had terminated because of 'Dealer becoming insolvent.'
 
 
 7
 Plaintiff admitted that by April of 1975, he could not pay his debts at they matured. He further testified that when his stores were taken over by Franchisor the month before he was paying his debts in a negotiated manner, but could not pay them as they matured in full.
 
 
 8
 The franchise agreements that plaintiff signed stated:
 
 
 9
 (a) [Franchisor] at its option . . . may immediately terminate this license . . . upon the happening of any of the following events: (i) If [Franchisee] shall . . . become insolvent.
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 (b) If [Franchisee] defaults in the performance of any of its obligations under this Agreement other than under (a) of this paragraph [Franchisor] may serve upon [Franchisee] a 30-day notice of default, which notice shall enumerate those acts which constitute a default. [Franchisee] shall then have 30 days from receipt of said notice in which to cure fully all of said defaults . . .. In the event [Franchisee] shall not fully cure said defaults within the 30-day period, then [Franchisor] shall have the absolute right without further notice to fully terminate this Agreement.
 
 
 13
 (emphasis added).
 
 
 14
 Franchisor claims that evidence adduced at trial established that plaintiff could not pay his debts as they came due; it claims that this was shown by (1) plaintiff's own admission; (2) his subsequent voluntary Chapter 11 bankruptcy petition on April 2, 1975; and (3) the financial records and other reports received by Franchisor prior to its decision to close the stores. Plaintiff on the other hand, claims that his assets exceeded his liabilities as evidenced by his bankruptcy petition for voluntary reorganization rather than liquidation in straight bankruptcy proceedings.
 
 
 15
 At trial plaintiff testified as to his claimed past profits at the various stores to establish damages as a result of Franchisor's alleged breach. Plaintiff projected his lost profits by multiplying prior years' net profit by the number of years remaining on the various franchise agreements. He introduced no corroborating evidence, however, to illustrate how he calculated his claimed net profit figures. Books, cash register tapes, and other business records were not introduced into evidence to support his own estimations. These business records, however, were claimed to be available to Franchisor, in connection with its auditing of plaintiff's stores.[1]
 
 
 16
 The jury awarded plaintiff damages of $1.00 for each of the five Ohio stores plaintiff owned and $112,000 for his Lexington store.
 
 I.
 
 17
 Franchisor argues that the court erred in permitting plaintiff himself to testify as to anticipated lost profits and particularly in permitting plaintiff to use summaries of his financial data rather than the actual financial books in determining its damages. As noted earlier, Franchisor objected to plaintiff, as his own 'expert,' estimating his future profits, but did not object to the admission into evidence of certain financial summaries. We deem Franchisor to have waived any best evidence objections by failing to make timely objections at trial.
 
 
 18
 With respect to its claim that plaintiff was required to present expert testimony concerning lost profits, rather than merely introducing its past profit estimates or summaries, Franchisor misinterprets Kentucky law. Its reliance on Illinois Valley Asphalt, Inc. v. Harry Berry, Inc., 578 S.W.2d 244 (Ky. 1979), is misplaced. In Illinois Valley, plaintiff testified 'If we had been able to maybe sell them forty-five thousand or fifty thousand tons we might have made--might have made maybe twenty-five cents a ton of that.' Id. at 245. The court noted
 
 
 19
 [i]n proving a claim of loss of profits of an established business, the record of past profits is usually the best available evidence. Mere 'estimates' of witnesses will not serve, if books were kept . . . 'Opinions of witnesses as to the amount of profits that would have been gained are not admissible, except where the opinion is that of an expert based upon relevant facts.' . . . ['C]ourts have . . . shown an increased willingness to award lost profits, subject always to the requirement that some rational basis for computation be furnished.'
 
 
 20
 We hold that the 'guess estimate' of [plaintiff] based on what might have happened 'if we had been lucky' falls far short of the quality of evidence required . . .
 
 
 21
 Id. at 246, quoting McCormick, Handbook on the Law of Damages, Sec. 28, 104-06 (1935); also quoting Dobbs, Handbook on the Law of Remedies, Sec. 3.3, 154 (1973) (court adding emphasis). The court did not proscribe testimony by a plaintiff concerning his future profits, rather the court found impermissible the plaintiff's conjecture of lost profits without some rational and reasonable evidence supporting his claim.
 
 
 22
 Plaintiff clearly has the burden of showing his damages with reasonable certainty. See Mitchell Coal Company v. United Mine Workers, 313 F.2d 78, 79 (6th Cir. 1963) ('loss of profits must be established by at least a reasonable probability and not on sheer speculation and guess work.') Mere uncertainty as to the amount will not, however, preclude recovery. Roadway Express, Inc. v. Don Stohlman & Associates, 436 S.W.2d 63 (Ky. 1968); see also Eastern Ky. Lumber Development Co. v. Waddell, 239 S.W.2d 68 (Ky. 1951) (plaintiff's testimony regarding his profit per board foot of lumber and his daily expenses provided a reasonable basis for determining future profits); Caney Creek Coal Co. v. Ellis, 437 S.W.2d 745, 749 (Ky. 1969) (introduction of income tax records and 'other evidence sufficient to reflect with reasonable certainty' the amount of lost profits is acceptable).
 
 
 23
 While retaining an expert to testify about growth potential, market trends, and other factors affecting expected profitability is preferable, the evidence plaintiff adduced at trial provided a sufficient basis for a claim of damages for alleged lost profits. The trial court was therefore not clearly erroneous in permitting the jury to base an award on plaintiff's testimony and his summary financial reports.
 
 II
 
 24
 Defendant further argues that the district court erred in not granting a directed verdict for it on the issue of liability for breach of contract. Generally, a directed verdict is appropriate when there is a complete absence of evidence, or there are no controverted issues of fact upon which reasonable men could differ.
 
 
 25
 [O]n a motion for a Directed Verdict, the Court should consider the evidence in the light most favorable to the party against whom the Motion was made, and give it the advantage of every fair and reasonable inference that the evidence can justify.
 
 
 26
 Rockwell International Corp. v. Regional Emergency Medical Services, 688 F.2d 29, 31 (6th Cir. 1982). Even considering the evidence in the light most favorable to plaintiff, we find the Court erred in not granting Franchisor's motion for directed verdict.
 
 
 27
 The court erred in not finding as a matter of law that plaintiff was insolvent at the time Franchisor repossessed the Ohio stores. Such a finding would have required the court to grant Franchisor's motion for judgment n.o.v. with respect to the jury's award of $1.00 each for the Ohio franchisees and the award for the Lexington franchise assuming Franchisor in fact had terminated that franchise[2] since the contracts permitted Franchisor immediately to terminate the franchisees upon plaintiff's insolvency.[3] In Krepps v. Commissioner, 351 F.2d 1 (2d Cir. 1965), the court defined 'insolvency' as the lack of liquid funds, or the inability to pay one's debts in the ordinary course of business as they become due. In United States v. Curtis T. Bedwell & Sons, 506 F. Supp. 1324 (E.D. Pa. 1981), the court addressed a problem strikingly similar to the insolvency issue in the instant case. The court there noted that 'insolvency' has two meanings. First is its bankruptcy meaning, in which the test is the comparison of the aggregate value of debtor's liabilities versus his assets. Id. at 1328. Second is its equity meaning in which the test is the ability or inability to meet obligations as they mature. The court noted that the parties' contract allowed for termination if 'subcontractor becomes bankrupt or insolvent.' The court held that since the contract used the language 'bankrupt or insolvent' that 'insolvent' included its equity sense of paying debts as they became due.
 
 
 28
 The contract in the instant case has language similar to that in Bedwell. It states that Franchisor can terminate the franchise immediately if franchisee is 'adjudicated a bankrupt, or become[s] insolvent.' The testimony indicates that plaintiff was not able to pay his debts as they matured prior to Franchisor's repossession of the Ohio franchises. Thus no issue concerning plaintiff's insolvency needed to be presented to the jury since plaintiff, in effect, conceded his inability to meet his debts as they matured. A directed verdict for Franchisor was appropriate on this issue.
 
 
 29
 Despite evidence that Franchisor may have waived plaintiff's failure to make royalty payments on time, this waiver would merely waive the provisions of part (b) of the franchisee agreement, which required thirty days notice prior to termination for franchisee's defaults in performance of his obligations under the agreement. Part (a) permitted immediate termination of the agreements upon the occurrence of insolvency. The waiver of one specific contractual provision does not waive all contractual provisions and rights of Franchisor. United Pacific Insurance Co. v. Collins, 389 S.W.2d 242 (Ky. 1964). When Franchisor determined that plaintiff was not able to pay his debts (other than royalty payments) as they came due, it had the contractual right immediately to terminate the franchise agreements. Franchisor's termination of plaintiff franchise agreements, therefore, comported with the express terms of the agreements.
 
 
 30
 For these reasons, we REVERSE and REMAND with instructions to grant Franchisor's motion for judgment n.o.v. Judgment will be entered for appellant accordingly.
 
 
 
 *
 Honorable Robert E. DeMascio, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 At trial Franchisor objected to plaintiff testifying about expected lost profits, and claimed that plaintiff should have retained an expert to testify about anticipated future profits. Despite plaintiff's failure to produce original records, during the trial Franchisor did not challenge plaintiff's use of, or the accuracy of, operating statement forms that plaintiff had prepared and that Franchisor's auditor earlier had reviewed
 
 
 [2]
 Although plaintiff claims that Franchisor terminated the Lexington franchise on March 4, 1975, and refers to the transcript, nowhere on the page cited by plaintiff does the testimony indicate that the Lexington store was taken over by Franchisor; and, in fact, plaintiff testified that 'They simultaneously hit eight locations with the dogs and the guards.' Plaintiff, however, owned or operated nine stores, and the evidence indicates that these eight stores were plaintiff's Ohio stores. Plaintiff's testimony, in fact, indicates that he controlled and operated the Lexington store until he filed for voluntary bankruptcy. But, even assuming that Franchisor's March 1 letter terminated the Lexington franchise, our determination that plaintiff was insolvent as a matter of law makes this alleged termination proper under the terms of the franchise agreement
 
 
 [3]
 Many of the franchises were operated and/or owned by separate corporate entities, but plaintiff did not treat them as separate entities. For example, although the Lexington store remained profitable, it was not paying its debts as they accrued. Further, at oral argument plaintiff conceeded that he negotiated supply contracts for the stores as a group